THE PEOPLE ex rel. Charles S. Deneen, Governor, and William H. Stead, Attorney General, Appellants, vs. THE ECONOMY LIGHT AND POWER COMPANY, Appellee.

*Opinion filed October 26, 1909.*

1. WATERS—*general presumption where party purchases from riparian owner.* While the grantor of a riparian estate may reserve the land under the water, yet the general presumption is that the purchaser's title extends as far as the grantor owned, in both fresh and tidal waters.

2. SAME—*the owner of land on both sides of river owns bed of stream.* The owner of land on both sides of a river owns the whole of the bed of the stream to the extent of the length of his lands upon it, and his conveyance of the land carries title to the bed of the stream, in the absence of any reservation in the deed or language denoting a different boundary.

3. SAME—*distinction as to ownership of bed of navigable and non-navigable streams.* In grants upon navigable waters above tide waters the riparian owner takes title to the thread of the stream, subject to the public easement of navigation; but as to waters not navigable the title to the bed of the stream passes absolutely, free from the public easement.

4. SAME—*a meander line is not ordinarily a boundary.* With the exception of cases where monuments are erected when the meander line is run the meander line is not a boundary line, but is designed to point out the sinuosities of the bank or shore and provide a means of ascertaining the quantity of land in the fraction which is to be paid for by a purchaser.

5. SAME—*meander line provision of the act of 1839 was superseded by act of 1843.* The provision of the act of 1839 relating to the sale of canal lands, which declared that lands situated upon streams which had been meandered by the United States surveys (which included the Desplaines river) should be considered as bounded by the meander line and not by the stream, is inconsistent with the act of 1843 for the pledging of the canal lands, and, as to lands sold under the act of 1843, to procure money with which to pay the debts created thereunder, was superseded by act of 1843.

6. SAME—*the State of Illinois does not own bed of Desplaines river in lands sold under act of 1843.* In the absence of any conditions, reservations or restrictions in deeds made by the canal trustees to lands bordering upon the Desplaines river, which had been acquired by the State under the government grant of 1827

and which passed as unsold lands to the canal trustees under the conveyance by the Governor under the act of 1843, the grantees in such deeds took title to the bed of the river, and the State is not the owner thereof.

7. SAME—*party alleging that stream is navigable has burden of proving such fact.* A complainant in a bill to enjoin the construction of a dam in a stream which is alleged in the bill to be navigable has the burden of proving such navigability as a question of fact, but he is not required to show that the stream is navigable for its entire length or that its navigable portion is open for use at all times of the year.

8. SAME—*navigability is to be determined with reference to natural condition of stream.* The navigability of a stream is to be determined with reference to its natural condition, and not with reference to conditions which exist after the construction of canals or other artificial channels which add to the volume of water.

9. SAME—*vested rights cannot be destroyed by making a non-navigable stream navigable.* If a stream is non-navigable in its natural condition the State has no power to destroy, without compensation, the vested rights of riparian owners by making the stream navigable by means of artificial additions to its waters.

10. SAME—*rule where stream naturally navigable is improved.* Where a stream which is, in fact, navigable in its natural condition is improved for the purpose of enlarging its usefulness, the public have a right to enjoy the easement in its enlarged condition.

11. SAME—*the State cannot destroy riparian rights in a non-navigable stream.* The State cannot directly by its own act or indirectly through the act of an agent change an unnavigable stream to one that is navigable without compensation to riparian owners for the destruction or damaging of their rights in the bed of the stream, as such rights are as much protected by the constitution as are rights in land above the water line of the stream.

12. SAME—*riparian owners not required to forfeit rights to aid improvement of non-navigable stream.* A navigable stream may be improved or a non-navigable stream may be made navigable with funds raised by general taxation; but property fronting upon the navigable stream cannot be specially assessed for the improvement of such stream for public benefit, nor can the owners of riparian rights in the non-navigable stream be compelled to surrender their rights, without compensation, to aid in its improvement.

13. SAME—*legislature cannot destroy vested rights by declaring stream to be navigable.* If a stream is not navigable in its natural condition, vested rights of riparian owners cannot be destroyed by an act of the legislature declaring such stream to be navigable.

14. SAME—*the Sanitary District act did not declare Desplaines river to be navigable.* Section 24 of the Sanitary District act, providing that when the channel is completed and the water turned in to a certain volume "the *same* is hereby declared a navigable stream," has reference only to the channel of the sanitary district, and not to the water after it leaves such channel and enters the Desplaines river.

15. SAME—*what is necessary to make stream a navigable one.* A stream, to be navigable, must in its ordinary, natural condition furnish a highway over which commerce is or may be carried on in the customary modes in which such commerce is conducted by water. (*Hubbard* v. *Bell,* 54 Ill. 110, and *Schulte* v. *Warren,* 218 id. 108, followed.)

16. SAME—*Desplaines river is not, in its natural condition, a navigable stream.* The Desplaines river, notwithstanding its occasional use as a means of transportation by the few early explorers and traders, is not, in its natural condition, a navigable stream.

17. CANALS—*an agreement for perpetual flowage is, in effect, a sale of an interest in land.* An agreement for perpetual flowage is, in effect, a sale of an interest in the land and a right of perpetual possession, and if such an agreement is made by the commissioners of the Illinois and Michigan canal, it must, under the Canal act of 1874, (Hurd's Stat. 1908, p. 220,) be made in accordance with the requirements of clause 8 of section 8 of such act.

18. SAME—*flowage contract of September 2, 1904, is not a perpetual license.* The flowage contract made September 2, 1904, between the commissioners of the Illinois and Michigan canal and Harold T. Griswold, and which is now assigned to the Economy Light and Power Company, is not a perpetual license, but must be regarded, in view of the other contracts executed between the parties and the statutory power of the commissioners, as being for a period of twenty years, notwithstanding the use of the word "perpetually" with reference to the said Griswold's obligation to keep the tow-path in repair.

19. SAME—*canal commissioners have power to lease "ninety-foot strip."* The commissioners of the Illinois and Michigan canal have no power to sell any land or any portion of the "ninety-foot strip" along the canal which is now utilized in connection with the use of water power, but they have power to lease canal lands and the ninety-foot strip for not to exceed twenty years, provided that where the lease is connected with a water power it must be made under clause 6 of section 8 of the Canal act of 1874.

20. SAME—*what is meant by lease of water power.* The leases of "water power and any lands or lots connected therewith," re-

ferred to in clause 6 of section 8 of the Canal act of 1874, and which the canal commissioners cannot lease without complying with the requirements of the statute, are leases of water power in the canal itself, and lands or lots connected therewith which the State owns and the commissioners are authorized to lease.

21. SAME—*flowage contract and lease herein involved are not a lease of water power.* The flowage contract and the lease of the "ninety-foot strip" made by the commissioners of the Illinois and Michigan canal September 2, 1904, to Harold T. Griswold, do not constitute a lease of water power and lands connected therewith, as meant by clause 6 of section 8 of the Canal act of 1874.

22. SAME—*the provision for renewal of leases applies only to leases of water power and land connected therewith.* The provision of clause 6 of section 8 of the Canal act of 1874 authorizing the commissioners to provide for an extension of its leases for a period of not to exceed twenty years, applies only to leases of "water power and lands or lots connected therewith," and has no reference to leases made by private treaty of "canal lands and lots owned by the State," as mentioned in clause 5 of said section.

23. SAME—*provision for renewal in lease of September 2, 1904, does not render entire contract void.* The provision for renewal, contained in the lease of September 2, 1904, made by the commissioners of the Illinois and Michigan canal to Harold T. Griswold, is void as being unauthorized by law; but its invalidity does not render the entire contract void, since such provision is an independent and severable covenant, which may be disregarded and the legal portion of the contract enforced.

24. SAME—*what is not ground for setting aside deed to canal lands.* The fact that a sale of canal lands was made by a third person acting at the request of the commissioners instead of by the commissioners in person is a mere irregularity which is not ground· for setting aside the deed, where the land was sold in accordance with the formalities required by statute, a deed executed to the purchaser and the purchase money received and retained by· the State, which was, in legal contemplation, the grantor in the deed, and where no steps were taken to avoid the sale while the title was in the original purchaser, whose record title was clear.

25. SAME—*the deed of January 6, 1905, to "sixteen-acre tract" passed entire title of State.* The quit-claim deed of January 6, 1905, from the commissioners of the Illinois and Michigan canal to Harold T. Griswold, conveying the so-called "sixteen-acre tract," was not a conveyance of any land connected with the water power of the canal but of land the commissioners had power to sell, and such deed was effective to convey the entire interest then owned by the State in such tract.

26. SAME—*the "Kankakee feeder" lease of August 8, 1905, is not a water power lease.* The "Kankakee feeder" lease, made August 8, 1905, between the commissioners of the Illinois and Michigan canal and Harold T. Griswold, is not a lease of water power, within the meaning of clause 6 of section 8 of Canal act of 1874.

27. SAME—*revocation provision of the "Kankakee feeder" lease construed.* The provision of the "Kankakee feeder" lease, (herein involved,) reserving the right to the canal commissioners to cancel the lease "whenever, in the judgment of the canal commissioners *or other proper officers of the State* at such time having charge of canal property, they shall deem the interests of the State require it, to re-possess and use said property," means the canal commissioners or such officers as the State may designate to have charge of the canal property in the place of the commissioners, and does not mean the legislature.

28. SAME—*when lease cannot be canceled except by canal commissioners.* The right of one party to the "Kankakee feeder" lease of August 8, 1905, to declare the contract at an end without the consent of the other party must be strictly construed, and as long as the State continues the canal commissioners in charge of canal property, such commissioners are the only officers who may, under the contract, cancel such lease, and their discretion in that regard cannot be exercised by State officials in another department of the State government.

29. SAME—*"Kankakee feeder" lease is not within joint resolution of 1907.* The joint resolution of the legislature adopted on November 27, 1907, is directed against certain leases made by the canal commissioners on September 2, 1904, and does not include the "Kankakee feeder" lease, which was executed August 8, 1905.

30. SAME—*canal commissioners may lease Kankakee feeder.* The commissioners of the Illinois and Michigan canal may treat the abandoned Kankakee feeder, and the lands and lots connected therewith, as other canal property, and may lease the same, during such time as it is not needed, for any lawful purpose which does not interfere with any right which the State may have to resume the use of such feeder for canal purposes.

31. SAME—*the "pole lease" of September 2, 1904, is not void.* The "pole lease," executed between the canal commissioners and Harold T. Griswold September 2, 1904, does not give to the said Griswold control of the tow-path of the canal for the length of the line, but merely gives him the right to place poles under the direction of the commissioners, and there is no ground for declaring such contract void unless the line of poles erected thereunder interferes with the use of the tow-path and canal.

32. CONTRACTS—*a contract by canal commissioners should be read in the light of the statute.* Where a flowage contract made by the canal commissioners specifies no time for its duration it must be inferred that the contract was made with reference to the statute under which the commissioners were acting, and the contract should be read in the light of such statute, and, if it is possible, such a construction should be given the contract as to render it valid rather than one which destroys it.

33. SAME—*rule where one attempts to grant a greater estate than he has.* Where one attempts to grant a greater estate than he has, the conveyance will be effective to pass the estate which he has though the grant may be inoperative as to the greater estate.

34. SAME—*contemporaneous agreements should be construed together.* Where different instruments are executed at the same time between the same parties with reference to the same subject matter, all of the instruments should be construed together in determining the real intention of the parties.

APPEAL from the Circuit Court of Grundy county; the Hon. JULIAN W. MACK, Judge, presiding.

WILLIAM H. STEAD, Attorney General, and JOEL C. FITCH, Assistant Attorney General, (WALTER REEVES, and MERRITT STARR, special counsel,) for the appellant:

The flowage contract, granting the right to flood the ninety-foot strip, the tow-path bank and the riparian tract in perpetuity, is a sale of real estate. *Woodward* v. *Seely,* 11 Ill. 157; *Water Power Co.* v. *Evans,* 166 id. 548; *Nellis* v. *Munson,* 108 N. Y. 453; *Mumford* v. *Whitney,* 15 Wend. 381; *Cook* v. *Stearns,* 11 Mass. 533; *Fitch* v. *Hydraulic Co.* 44 Mich. 76.

Even a license to erect a permanent dam on another's land or to overflow another's land must be by deed, for it is the sale of an estate in land. *Brown* v. *Woodworth,* 5 Barb. 550; *Houghtaling* v. *Houghtaling,* id. 379; *Davis* v. *Townsend,* 10 id. 338.

The interest purported to be conveyed by the flowage contract is perpetual. No words of inheritance are necessary to the creation of a perpetual right of flowage. *Cole*

v. *Lake County,* 54 N. H. 242; *Clark* v. *Strong,* 105 N. Y. App. Div. 179; *Sweetland* v. *Power Co.* 46 Ore. 85.

The flowage contract, if valid, conveys an estate, which precludes the grantor from any use inconsistent with the beneficial exercise of the flowage right. *Phillips* v. *Reservoir Co.* 108 Mass. 404; *Woodward* v. *Seely,* 11 Ill. 164.

The flowage contract, as such sale violates the statute forbidding a sale of canal real estate except upon advertisement and to the highest bidder, is void. Rev. Stat. chap. 19, sec. 8; Laws of 1899, p. 82.

The flowage contract was beyond the powers of the canal commissioners and is void. The power to make this contract is not conferred upon the commissioners. 4 Starr & Cur. Stat. chap. 19.

Acts of the commissioners not within the terms of the statutes are void. *Canal Comrs.* v. *Calhoun,* 1 Scam. 521; *State* v. *Delafield,* 8 Paige's Ch. 528; *Diederich* v. *Rose,* 228 Ill. 610.

The grants of the commissioners in derogation of public rights are strictly construed and not extended by implication. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 426; *Snell* v. *Chicago,* 133 Ill. 439.

Clause 9 of the flowage contract in express terms authorizes the invasion of the canal. This subordinates the public property to private purposes and is illegal and beyond the power of the canal commissioners. The flowage contract is therefore illegal and void. *Synder* v. *Mt. Pulaski,* 176 Ill. 397; *Morrison* v. *Hinkson,* 87 id. 587; *Attorney General* v. *Forbes,* 2 M. & C. 123; *Frewen* v. *Lewis,* 4 id. 249.

The canal leases are illegal and void. They contain renewal clauses for a second term of twenty years. Canal leases are limited by statute to twenty years. 4 Starr & Cur. Stat. chap. 19, sec. 8, clause 5.

The renewal clause amounts, in itself, to making the lease for extended term. *Noonan* v. *Orton,* 27 West. 300.

Inasmuch as the leases attempt to grant a term of longer than twenty years they are void. *Canal Comrs.* v. *Calhoun,* 1 Scam. 521; *Diederich* v. *Rose,* 228 Ill. 610; *State* v. *Delafield,* 8 Paige's Ch. 528.

The lease for the purpose of flooding the ninety-foot strip and tow-path bank for several miles endangers the canal and is an invasion of part of the canal. The berm bank of the canal is part thereof, and is equally protected by law from all occupancy or intrusion as any other part. *Ohio* v. *Railroad Co.* 37 Ohio St. 157.

The foot-path or tow-path, and strip of land occupied by it, along the canal, is part of the canal. *Alexander* v. *Tolleston Club,* 110 Ill. 65; *Morgan* v. *Bass,* 14 Fed. Rep. 454; *Edwards* v. *Schlund,* 21 Ohio St. 193; *Canal Co.* v. *Harris,* 101 Pa. 80.

The ninety-foot strip, the tow-path and the berm bank are integral parts of the canal, and cannot be leased or put to any use or subjected to any burden other than for canal purposes. The leasing of several miles of the ninety-foot strip and tow-path bank being for private purposes is therefore illegal. *Ohio* v. *Railroad Co.* 37 Ohio St. 157.

The canal commissioners hold the canal, with all its incidents, in trust for public uses, and can grant no easement therein for the benefit of private parties and to the exclusion of the public. *Snyder* v. *Mt. Pulaski,* 176 Ill. 397; *Field* v. *Barling,* 149 id. 556; *Hibbard* v. *Chicago,* 173 id. 91; *Driggs* v. *Phillips,* 103 N. Y. 77; *Smith* v. *State,* 23 N. J. L. 712; *Attorney General* v. *Heishon,* 18 N. J. Eq. 410; *State* v. *Woodward,* 24 Vt. 92.

The power conferred on these officers is limited to public purposes and must be expressed and cannot be exceeded. Any fair, reasonable doubt concerning the existence of the power of public officers to devote public property to questionable uses is resolved by the courts against the corporation and the power is denied. 1 Dillon on Mun. Corp. secs. 55, 251; *Emmons* v. *Lewistown,* 132 Ill. 380; *Chi-*

*cago* v. *McCoy,* 136 id. 344; *Cairo* v. *Bross,* 101 id. 475; *Huesing* v. *Rock Island,* 128 id. 465.

The Kankakee feeder lease has been canceled. The lease expressly reserved to the canal commissioners the right to cancel. The effect of the act of the General Assembly of December 6, 1907, (Laws of 1907, p. 32,) was to exercise this right of cancellation. The legislature may exercise such right. *Laramie County* v. *Albany Co.* 92 U. S. 307; *Russell* v. *Reed,* 27 Pa. St. 170.

The Kankakee feeder lease is a water power lease, and is void because it violates the provision of the statute requiring public letting of water power to the highest bidder. 4 Starr & Cur. Stat. chap. 19, sec. 8, clauses 6, 7.

The fact that the feeder was out of use and out of repair does not confer authority to sell it, lease it or give it away. The title to the feeder lands does not revert or leave the State by non-user. *Rexford* v. *Knight,* 11 N. Y. 308; *Frank* v. *Evansville Co.* 111 Ind. 132; *Mason* v. *Railway Co.* 1 Fed. Rep. 712; *Craig* v. *Allegheny,* 53 Pa. St. 477; *White* v. *State,* 14 Ohio, 468.

No length of non-user will extinguish the rights of the State in the canal property. *Curran* v. *Louisville,* 83 Ky. 628; *Donahue* v. *State,* 112 N. Y. 142; *State* v. *Doig,* 2 Rich. 179.

The sale of the canal lands was made by an employee of the canal commissioners, in the absence of all the commissioners and without any authority conferred upon him, and was void. *Mason* v. *Wait,* 4 Scam. 127; *Sebastian* v. *Johnson,* 72 Ill. 282; *Heyer* v. *Deaves,* 2 Johns. Ch. 154; *Powell* v. *Tuttle,* 3 N. Y. 396; *Moss* v. *Peary,* 2 Pat. & H. 483; *Noland* v. *Noland's Admr.* 75 Ky. 426; *Bickerton* v. *Grimes,* 8 Wash. 451; *Cheatham* v. *Phillips,* 23 Ark. 80.

The deed of the riparian tract is void. Inasmuch as the sale of this tract is void the deed made in pursuance of that sale is void. The deed expressly renews the void covenants of the canal commissioners in the void flowage con-

tract, and is therefore void. The deed is subject to the reserve of the flowage right, which (because the flowage contract is void) never left the canal commissioners. It therefore failed to take effect. The entire series of contracts is against public policy and void. *Crawford* v. *Wick,* 18 Ohio St. 190; *Holloday* v. *Patterson,* 5 Ore. 177; *Richardson* v. *Crandall,* 48 N. Y. 343.

A contract which in its execution will contravene the policy and spirit of a statute is equally void as if made against its positive provisions. *Diederich* v. *Rose,* 228 Ill. 610; *Gunther* v. *Dewine,* 11 Iowa, 133; *Dement* v. *Rokker,* 126 Ill. 174.

The State of Illinois owns the bed of the Desplaines river, and some adjoining land on each side thereof, at the site of the proposed dam and power house of the defendant, the Economy Light and Power Company, together with the water of the river. The act of 1839 makes the meander line the boundary of the lands at the site of the proposed dam and reserves the bed of the river to the State. The purpose and effect of this act was to change, with reference to canal lands, the rule that the riparian owner takes to the center thread of the stream, and to make the meander line the boundary of canal lands situated on meandered streams, conveyed by canal deeds. This provision of the act of 1839 has not been expressly repealed. It has not been repealed by implication, because no subsequent acts of the legislature are inconsistent with it or repugnant to it. It is essential to a repeal by implication that the repugnance between the statutes must be so clear and plain that they cannot be reconciled. *East St. Louis* v. *Maxwell,* 99 Ill. 439; *Harding* v. *Railroad Co.* 65 id. 93; *Hume* v. *Gossett,* 43 id. 299; *Supervisors* v. *Campbell,* 42 id. 492; *People* v. *Barr,* 44 id. 201; *Fowler* v. *Pirkins,* 77 id. 274; *Ottawa* v. *LaSalle,* 12 id. 339; *Hyde Park* v. *Cemetery Ass.* 119 id. 141; *Tyson* v. *Postlethwaite,* 13 id. 141; *Hunt* v. *Railway Co.* 121 id. 638.

There is no conflict between the act of 1839 and the act of 1843. The former is permanent, the latter is temporary. The evidence shows that the Desplaines river was meandered through the south-east quarter of section 25, in which the proposed dam is located. That part of the south-east quarter section outside of the meander line is large enough to exclude it from a grant of the land within the meander line. *Houck* v. *Yates,* 82 Ill. 542; *Fuller* v. *Dauphin,* 124 id. 542; *Canal Trustees* v. *Haven,* 5 Gilm. 548; *Railroad Co.* v. *Schurmeier,* 7 Wall. 272; *Fuller* v. *Shedd,* 161 Ill. 462.

The canal legislation shows several renewals of the act of 1839 and a legislative intent and policy to keep it in force. The act of February 26, 1839, amends "the several laws in relation to the Illinois and Michigan canal," and enacts the meander line into a true boundary and forbids a sale of the bed of the stream in canal lands. This amendment therefore became a part of the said "several laws in relation to the Illinois and Michigan canal." *Holbrook* v. *Nichol,* 36 Ill. 161; *Turney* v. *Wilton,* id. 385; Endlich on Statutes, sec. 294; *Blair* v. *Chicago,* 201 U. S. 400; *Regina* v. *Overseers,* 3 El. & El. (107 E. C. L.) 224.

The several canal acts heretofore cited, reserving to the State all the waters and streams, reserve title to the waters of the Desplaines. The State owning the water, owns it in trust for the whole people for the paramount right of navigation, and, subject thereto, the flow thereof in trust for the riparian owners. *Railroad Co.* v. *People,* 214 Ill. 9; *Druley* v. *Adam,* 102 id. 193; *People* v. *Canal Appraisers,* 33 N. Y. 461.

Grants of lands under or around a navigable stream imply no intent to discontinue the public right therein. *Lumber Co.* v. *Olcott,* 65 N. H. 380; *Shively* v. *Bowlby,* 152 U. S. 10; *Thompson* v. *River Co.* 58 N. H. 1.

The Boyer deed should not be construed to convey the bed of the stream, because grants in derogation of public

rights are to be strictly construed and not extended by implication. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 426; *Snell* v. *Chicago*, 133 Ill. 439.

In a grant of property, franchises or privileges in which the government or public is interested, all doubts are resolved in favor of the State. Nothing passes by mere implication. *Mining Co.* v. *South Carolina*, 144 U. S. 550; *Railroad Co.* v. *Packet Co.* 125 id. 260; *Stein* v. *Water Co.* 141 id. 67; *Holyoke Co.* v. *Lyman*, 15 Wall. 500.

A grant by the State of the right to maintain a dam in a navigable stream, while valid so long as Congress has not acted, is subject to the right of Congress to interfere in the matter whenever it may deem necessary to do so. *Pound* v. *Turck*, 95 U. S. 459.

It follows that all doubts as to the repeal of the meander line provision of the act of 1839 should be resolved in favor of the State and that provision be held not to have been repealed. The burden rests with the defendant to prove its right to build and maintain the dam. *Railway Co.* v. *Railway Co.* 37 Fed. Rep. 129; *Railway Co.* v. *Parsons*, 74 id. 408; *Doxsey* v. *Railroad Co.* 35 Hun, 362; *Cantrell* v. *Railroad Co.* 90 Tenn. 638.

The Desplaines river is a navigable stream. A navigable stream is a stream having sufficient depth of water to afford a channel for useful commerce. *Schulte* v. *Warren*, 218 Ill. 108; *People* v. *St. Louis*, 5 Gilm. 351; *Railway Co.* v. *Healy*, 94 Ill. 416; *Ligare* v. *Railroad Co.* 139 id. 46; *Houck* v. *Yates*, 82 id. 179; *Chicago* v. *McGinn*, 51 id. 66; *Railroad Co.* v. *Stein*, 75 id. 41; *Ice Co.* v. *Shortall*, 101 id. 46; *Chicago* v. *Law*, 144 id. 569; *Geneseo Chief* v. *Fitzhugh*, 12 How. 443.

A stream which can be used is navigable. *Commonwealth* v. *Vincent*, 108 Mass. 441.

If it can be used at certain seasons by barges it is navigable. *Bucki* v. *Cone*, 25 Fla. 1; *Brodnax* v. *Baker*, 94 N. C. 675.

Where streams are of sufficient depth, naturally, for valuable navigation by flat-boats and small vessels of light draft, the public has the right to a free enjoyment of the streams, for the purpose of navigation to which they are naturally adapted. *Goodwill* v. *Police Jury,* 38 La. Ann. 752; *Webster* v. *Harris,* 59 L. R. A. 324; *State* v. *Baum,* 128 N. C. 600; *Tuscaloosa County* v. *Foster,* 132 Ala. 392.

Pecuniary profit is not an essential of navigability. *Attorney General* v. *Woods,* 108 Mass. 436; *Lamphrey* v. *State,* 52 Minn. 181.

All waters practically available for floating commerce by any method are navigable, as the servitude of public interests depends rather on the purpose for which the public requires the use than any particular mode of use. *Moore* v. *Sanborne,* 2 Mich. 519.

"Commerce" is not confined to the transportation of freight. Travel by persons and the transportation of persons by boats is "commerce." *Gibbons* v. *Ogden,* 9 Wheat. 1; *Passenger cases,* 7 How. 286.

Commerce is intercourse. It includes the intercourse and all the initiatory and intervening acts, instrumentalities, dealings, means and appliances. *Brennan* v. *Titusville,* 153 U. S. 289; *Hall* v. *DeCuir,* 95 id. 485; *McNaughton* v. *McGirl,* 20 Mont. 124.

The early travel on the Desplaines river was commerce. The observation in *Hubbard* v. *Bell,* 54 Ill. 110, that a stream having sufficient capacity merely to float logs is not a navigable stream is dictum, was uncalled for, and is erroneous. The former dams and bridges crossing the river do not change its character or prevent its navigation. *Railroad Co.* v. *People,* 214 Ill. 9; *Clarke* v. *Lake,* 1 Scam. 229.

The two existing dams at Marseilles and Joliet are subject to removal by the State for navigation purposes, and therefore the navigability of the river is to be determined independently of their presence. Removable difficulties and partial limitations do not control navigability. The exist-

ence of obstructions and interruptions is not controlling. *Montello case,* 20 Wall. 430; *Water Power Co.* v. *Water Comrs.* 168 U. S. 349; *In re State Reservation at Niagara Falls,* 37 Hun, 537; *Brodnax* v. *Baker,* 94 N. C. 675; *Attorney General* v. *Harrison,* 12 Grant's Ch. 466; *Goodwill* v. *Police Jury,* 38 La. Ann. 752; *Inhabitants of Charleston* v. *Middlesex County Comrs.* 44 Mass. 202; *State* v. *Bell,* 5 Port. 365.

The existence of artificial obstructions, such as dams, bridges and fences, does not deprive the stream of its character nor the public of its rights. *Clarke* v. *Lake,* 1 Scam. 229; *Railroad Co.* v. *People,* 214 Ill. 9.

A stream need not be navigable in its entirety. *Schulte* v. *Warren,* 218 Ill. 108; *Spooner* v. *McConnell,* 1 McLean, 337; *Hempstead* v. *New York,* 52 N. Y. (App. Div.) 182.

It is not necessary that the stream be navigable all the year round. *Cummins* v. *Spruance,* 4 Harr. 315; *Colchester* v. *Brook,* 7 Queen's Div. 339.

Interruption by ice in the winter months, it was early settled, did not destroy navigability, and this court put low water in summer and closure by ice in the winter on the same footing. *Packet Co.* v. *Bridge Ass.* 38 Ill. 467.

Capacity for navigation in a period sufficiently regular and continued to make the stream available for travel or commerce is sufficient. *Walker* v. *Allen,* 72 Ala. 456; *Berk Co.* v. *Lumber Co.* 116 N. C. 731; *Railroad Co.* v. *Brooks,* 39 Ark. 403; *Pierpont* v. *Loveless,* 72 N. Y. 211; *Smith* v. *Fonda,* 64 Miss. 551; *Thunder Bay Co.* v. *Speechly,* 31 Mich. 336.

Actual use is not necessary—capacity for use is sufficient. *The Daniel Ball,* 10 Wall. 557; *Hickok* v. *Hine,* 23 Ohio St. 523; *Attorney General* v. *Eau Claire,* 37 Wis. 400; *Heyward* v. *Farmers' Mining Co.* 42 S. C. 138.

It is not necessary that it be navigable up-stream,—that is, against the current. 1 Farnham on Waters, sec. 25; Angell on Highways, 45; *Sigler* v. *State,* 7 Baxt. 493;

*TenEyck* v. *Warwick,* 75 Hun, 562; *Manufacturing Co.* v. *Railroad Co.* 117 N. C. 579; *Pipe Line Co.* v. *Railroad Co.* 10 Abb. 107.

A stream is navigable "if of sufficient capacity to float the products of the mines, the forests or the tillage of the country through which they float, to market." *Lewis* v. *Coffee County,* 77 Ala. 190; *Sullivan* v. *Spotswood,* 82 id. 163; *Webster* v. *Harris,* 69 S. W. Rep. 782.

The fact that there is no present use and no present injury is immaterial. *Attorney General* v. *Smith,* 109 Wis. 532; *People* v. *St. Louis,* 5 Gilm. 368.

Future development of the country must be considered as well as present or past use. *Jones* v. *Johnson,* 6 Tex. Civ. App. 262.

The public right is not lost by non-user. No length of time will substantiate the right to exclude the public from the use of the stream. No right can be acquired by prescription which will interfere with this right of navigation. *Beidler* v. *Sanitary District,* 211 Ill. 628; *Parker* v. *People,* 111 id. 581; *Alton* v. *Transportation Co.* 12 id. 38; *Arundel* v. *McCulloch,* 10 Mass. 70; *Commonwealth* v. *Charleston,* 1 Pick. 180; *Canal Co.* v. *Harris,* 101 Pa. St. 80; *Burbank* v. *Fay,* 5 Lans. 397; *Attorney General* v. *Cooper Co.* 152 Mass. 444.

The public right in a navigable water-course is non-alienable. *Railroad Co.* v. *People,* 214 Ill. 9; *Cox* v. *State,* 3 Blackf. 193.

Statutes declaring streams navigable are competent to define the standard of navigability, and *prima facie* establish the public character of the stream. *Clarke* v. *Lake,* 1 Scam. 229; *Coovert* v. *O'Connor,* 8 Watts, 476; *Canal Co.* v. *Landis,* 9 id. 228; *Horton* v. *Pace,* 9 Tex. 1; *Harrison* v. *Holland,* 3 Gratt. 247.

If a stream is navigable for part of the time it will be regarded as a navigable stream when so declared by the legislature. *State* v. *Dibble,* 49 N. C. 107; *Davis* v. *Jer-*

*kins,* 50 id. 290; *Baker* v. *Lewis,* 33 Pa. 301; *Denton* v. *State,* 76 N. Y. Sup. 167; *Cooper* v. *Hall,* 5 Ohio, 320; *White* v. *Jefcote,* 10 Rich. L. 389; *Selman* v. *Wolfe,* 27 Tex. 68.

The court will take judicial notice of the existence of rivers and creeks emptying into the Illinois river, and of the fact that they carry large quantities of sand, sediment and debris into such river and that still the Illinois river is a navigable river.  *Canal Comrs.* v. *East Peoria,* 179 Ill. 214.

The variable and progressive development of navigation does not destroy the public right in streams originally navigable.  An existing public right of navigation is not lost by changes in the condition or use of the stream.  *Attorney General* v. *Eau Claire,* 37 Wis. 400; *People* v. *Page,* 39 N. Y. (App. Div.) 110.

No intention will be implied to discontinue the right of way in the stream.  *Lumber Co.* v. *Olcott Falls Co.* 64 N. H. 290.

Changes in the stream, increasing its depth and improving the navigation, enlarge the right of navigation, and a stream so improved is to be considered in its latter capacity.  *Schulte* v. *Warren,* 218 Ill. 108.

The waters of Lake Michigan added to the Desplaines river by the sanitary district channel lawfully and permanently improved the navigation of the river, and its navigability is to be judged as so lawfully and permanently improved.  *Schulte* v. *Warren,* 218 Ill. 108; *Mendota Club* v. *Anderson,* 101 Wis. 479; *Smith* v. *Youman,* 96 id. 103; *Pewaukee* v. *Savoy,* 103 id. 271.

ISHAM, LINCOLN & BEALE, and SCOTT, BANCROFT & STEPHENS, (JOHN P. WILSON, FRANK H. SCOTT, and GILBERT E. PORTER, of counsel,) for appellee:

Meander lines are not boundaries, but are run for the purpose of defining the sinuosities of the banks.  They do not limit the title of the riparian owner.  *Ross* v. *Faust,*

54 Ind. 471; *Whitaker* v. *McBride,* 197 U. S. 510; *Canal Trustees* v. *Haven,* 5 Gilm. 548; *Bridge Co.* v. *People,* 197 Ill. 199; *Schurmeier* v. *Railroad Co.* 10 Minn. 82; *Railroad Co.* v. *Schurmeier,* 7 Wall. 272; *Houck* v. *Yates,* 82 Ill. 179; *Orn* v. *Smith,* 159 U. S. 40.

The act of 1839 did not apply to canal lands generally, but only to those authorized to be sold prior to that date. The act of 1843 was a conveyance, by way of mortgage, of all the canal properties, unaffected by any of the provisions of the act of 1839.

The attitude of the State since the passage of the act of February 26, 1839, has been uniformly inconsistent with the claim that the title to the bed of the stream was reserved by it. The deed from the canal trustee to Boyer contained no reservation of the bed of the stream, and under well settled rules of construction his deed carried the bed of the stream. *Braxon* v. *Bressler,* 64 Ill. 488; *Bridge Co.* v. *People,* 197 id. 199; *Trustees* v. *Schroll,* 120 id. 509; *Piper* v. *Connelly,* 108 id. 646; *Bridge Co.* v. *Johnson,* 188 id. 472.

A party to a contract cannot pronounce its own deed invalid although that party be a sovereign State. *Fletcher* v. *Peck,* 6 Cranch, 87.

The reports of the canal trustees and canal commissioners show that the bed of the stream was not reserved. This court has held that the bed of the stream in odd numbered sections belongs to the riparian owner. *Chicago* v. *VanIngen,* 152 Ill. 624; *Druley* v. *Adam,* 102 id. 177.

The claim of the State to the bed of the stream is stale, and the rule of *laches* applies in equity to a sovereign State with reference to its proprietary interests, the same as it does to its citizens. *United States* v. *Chandler-Dunbar Co.* 152 Fed. Rep. 25.

The Desplaines river is not a navigable stream. To be navigable a stream must, in its natural condition and at its ordinary volume of water, afford a channel for useful

commerce. *Canal Trustees* v. *Haven,* 5 Gilm. 548; *Hubbard* v. *Bell,* 54 Ill. 110; *Schulte* v. *Warren,* 218 id. 108; *Railroad Co.* v. *Healy,* 94 id. 416; *Healy* v. *Railroad Co.* 116 U. S. 191; *Rowe* v. *Bridge Corporation,* 21 Pick. 344; *Weathersfield* v. *Humphrey,* 20 Conn. 217; *Harrison* v. *Fite,* 148 Fed. Rep. 78.

Depth alone is not the test. *Little Rock* v. *Brooks,* 39 Ark. 403; *Harrison* v. *Fite,* 148 Fed. Rep. 78; *State* v. *Gilmanton,* 14 N. H. 457.

We do not claim that the stream must be navigable in its entirety, nor that obstructions and interruptions render an otherwise navigable stream unnavigable.

The *Montello case,* 20 Wall. 430, *Water Power Co.* v. *Water Comrs.* 168 U. S. 349, *In re State Reservation at Niagara Falls,* 16 Abb. 159, and *Brodnax* v. *Baker,* 94 N. C. 675, cited by counsel, involved large rivers which were intercepted by falls, but which were in common use as highways for useful commerce both above and below the falls.

The navigability of a stream is to be determined by its natural condition and ordinary volume of water, without the necessity of any improvement or artificial aid. *Thunder Bay Co.* v. *Speechly,* 31 Mich. 36; *Druley* v. *Adam,* 102 Ill. 177; *Pearson* v. *Rolfe,* 76 Me. 380; *Hall* v. *Lacy,* 3 Grant's Cas. 264; *Morgan* v. *King,* 35 N. Y. 454; *Carter* v. *Thurston,* 42 Am. Rep. 584; *Lewis* v. *Coffee County,* 77 Ala. 190; *Morrison Bros.* v. *Colemand,* 87 id. 655; *Coapman* v. *Blodgett,* 70 Mich. 610; *Stratton* v. *Currier,* 81 Me. 497.

The burden of proof of navigability is upon the party asserting it. *Ligare* v. *Railroad Co.* 166 Ill. 249; *Olive* v. *State,* 86 Ala. 88; *Gaston* v. *Mace,* 33 W. Va. 14.

The navigability of the Desplaines river is not to be determined by its capacity as improved by the addition of waters by the sanitary district. Changes in the art of navigation cannot affect the titles of riparian owners. *Railway Co.* v. *People,* 214 Ill. 9, *Schulte* v. *Warren,* 218 id. 108,

and *Mendota Club* v. *Anderson,* 101 Wis. 479, cited by counsel, do not hold to the contrary.

Neither the construction of the sanitary district channel nor the act authorizing it affected the defendant's water power rights. *Railroad Co.* v. *Sanitary District,* 218 Ill. 294; *Druley* v. *Adam,* 102 id. 177; *Tourtelotte* v. *Phelps,* 4 Gray, 370; *Lovington* v. *St. Clair County,* 64 Ill. 56; *Chicago* v. *Laughlin,* 49 id. 172; *Beidler* v. *Sanitary District,* 211 id. 628.

A stream which is in its natural condition not navigable cannot be made so by legislative action, to the detriment of the vested interests of riparian owners. *Ronayne* v. *Loranger,* 66 Mich. 73; *Walker* v. *Board of Public Works,* 16 Ohio, 540; *Murray* v. *Preston,* 106 Ky. 561.

The flowage contract and the lease of the riparian tract do not constitute a water power lease, within the meaning of section 8 of the act of March 27, 1874. The ninety-foot strip is not an integral part of the canal and was subject to be leased. *Canal Trustees* v. *Railroad Co.* 14 Ill. 314.

The deed to Griswold of January 6, 1905, was valid. The main ground upon which the attack upon the deed is based is that none of the commissioners were present at the time of the sale. This is not alleged or relied on in the bill, and the complainant cannot have relief upon grounds other than those upon which the bill proceeded. *Vennum* v. *Vennum,* 61 Ill. 331; *House* v. *Davis,* 60 id. 367; *Heath* v. *Hall,* 60 id. 344; *Randolph* v. *Onstott,* 58 id. 52.

Appellee, as an innocent purchaser from the grantee at the commissioners' sale, would not have been affected even though the conduct of the sale had been irregular. *Linnertz* v. *Quilty,* 191 Ill. 174; *McHany* v. *Schenk,* 88 id. 365; *Chambers* v. *Jones,* 72 id. 275.

The flowage contract was not in perpetuity. *DeFlorez* v. *Raynolds,* 8 Fed. Rep. 434; *People* v. *Telephone Co.* 220 Ill. 238; *People* v. *Telephone Co.* 232 id. 260; *Blair* v. *Chicago,* 201 U. S. 400.

The contracts and leases, so far as they affect the Kankakee feeder, are valid and binding. *Hubbard* v. *Toledo,* 21 Ohio St. 379.

Mr. JUSTICE VICKERS delivered the opinion of the court:

This is a direct appeal to this court from a decree of the circuit court of Grundy county dismissing for want of equity an information in the nature of a bill in equity filed by the Attorney General on behalf of the People, on the relation of Charles S. Deneen, Governor of the State of Illinois, against the Economy Light and Power Company, to restrain said company from erecting a 'dam across the Desplaines river and to cause the removal of that portion of the dam already constructed, and to prevent other injuries to the property of the State which it is alleged will result from the construction and maintenance of said dam.

Appellant bases its claim to relief on three propositions, as follows: (1) That the State of Illinois owns the bed of the river at the point where it is proposed to build said dam; (2) that the Desplaines river is a navigable stream, and that the proposed dam would constitute an obstruction to navigation; (3) that certain contracts executed by the commissioners of the Illinois and Michigan canal, under which appellee claims certain rights in connection with the construction of said dam, are void, and that no rights were acquired by or can be asserted under said contracts.

It is conceded by appellee that if the State of Illinois owns the fee in the bed of the Desplaines river at the point where the proposed dam is to be located, or if said river is a navigable stream at that point, appellee has no right to build the dam. Whether the same result would follow if the instruments referred to in the third proposition were held invalid is one of the controverted questions between the parties. The questions involved in each of appellant's propositions arise out of facts which have but little, if any, bearing on the other contentions. It will therefore conduce

to a clearer understanding to examine these propositions separately, in the light of the facts applicable to each.

THE TITLE OF THE STATE TO BED OF THE RIVER.— The validity of appellant's claim of title to the bed of the river at the point where the dam is located depends upon the construction of certain statutes passed by the legislature in relation to the Illinois and Michigan canal. The consideration of the legal questions involved in appellant's claim of title to the bed of the river will be facilitated and the ultimate result clarified by a brief review of the history of the Illinois and Michigan canal prior to the passage of the particular statute a construction of which is involved in this question.

The possibility of connecting the waters of Lake Michigan with the Illinois river by means of an artificial channel, thence through the Mississippi river to the Gulf of Mexico, thus establishing a continuous waterway for commerce from the lakes on the north to the gulf on the south, was at a very early time appreciated and its consummation cherished by the early traders and explorers as a work of first importance, both from a commercial and military standpoint. The portage between the south branch of the Chicago river and the Desplaines was only a few miles, and it was confidently believed that these two streams could be connected by an artificial channel at a cost that would be trifling in comparison with the commercial benefits that were expected to result. Experience has shown, however, that the cost of the canal, first and last, has been nearly twenty times the original estimate and that its practical benefits have fallen much below its promoters' expectations. The subject of constructing the canal was first brought to the attention of the Federal Congress in 1801 by Albert Gallatin, in a report recommending its construction by the general government. In 1816 a government survey was made of the proposed route, and after Illinois was admitted into the Union the attention of the new State was turned to the

proposed connecting waterway. In 1822 Congress passed an act authorizing the State of Illinois to survey and mark through the public lands of the United States the route of a canal connecting the Illinois river with the southern bend of Lake Michigan, and vesting in the State the perpetual use of a strip of land ninety feet wide on each side of said canal for canal purposes, subject to certain conditions which have either been complied with or waived by subsequent acts and therefore need not be stated. (Stead's Canal Laws, p. 1.)

During an extra session of the Illinois legislature, in 1826, a memorial was addressed to the Congress of the United States in which the great advantages, both to the nation and the State, of the proposed canal were eloquently set forth and the liberality of Congress was appealed to to make a grant of public lands to aid the State "to commence and complete this great and useful work." In this memorial it was stated that "your memorialists have caused the route to be explored and estimates to be made of the probable expense of the work, from which it appears that the cost of constructing the canal will not be less than $600,000 and may possibly amount to $700,000." The effect of this memorial was to attract the attention and awaken the generous patronage of the Federal Congress, and on March 2, 1827, an act was passed granting to the State of Illinois, for the purposes stated, a quantity of land equal to one-half of five sections in width on each side of said canal, from one end thereof to the other. The lands thus granted to the State, when selected and set apart, were found to contain approximately 300,000 acres, which were subject to the disposal of the State legislature "for the purposes aforesaid and no other." In 1829 the legislature passed an act authorizing the appointment of a board of canal commissioners to explore, examine, fix and determine the route of the canal, and dispose, by sale, of the lands and lots and commence the work. Under this act Gov. Edwards appointed Charles

Dunn, Dr. Gersham Jayne and Edmond Roberts as commissioners. For lack of funds the commissioners were able to accomplish but little. February 15, 1831, an amendatory act was passed. Under the provisions of these two acts the board of commissioners laid out the towns of Chicago and Ottawa and caused a new survey and estimate to be made by engineer Bucklin, whose estimate showed that the canal, instead of costing $600,000 or $700,000, as the legislature had stated in its memorial, would cost $4,043,386.50,—and this estimate proved to be too low by half. In view of the unexpected increase in the cost of the canal the plan of substituting a railroad for the canal was favorably considered for a time, and with this in view a survey and estimate for the railroad were made, a law passed abolishing the office of canal commissioners and the consent of the Federal government to use the land granted in constructing a railroad instead of a canal was obtained.

In 1835 the canal proposition was again taken up and an act passed authorizing the Governor to negotiate a loan, not exceeding $500,000, solely on the pledge of the canal lands and tolls. Certificates were to be issued, called "Illinois and Michigan canal stock," which were to be sold at not less than face value. This effort to raise money proved a failure. Ex-Gov. Coles, who then resided at Philadelphia, was appointed agent of the State to negotiate the loan, and in April, 1835, he wrote that capitalists were unwilling to take the stock certificates because they were not based upon the faith of the State. To obviate the objections thus raised the act of January 9, 1836, was passed, which repealed the act of 1835 and authorized the same loan of $500,000 on the credit of the State, which was irrevocably pledged for the payment of both principal and interest. The money thus borrowed, together with the proceeds of canal lands and lots, constituted a fund with which the actual construction of the canal was commenced, and on July 4, 1836, ground was first broken for the canal.

Two general plans of construction had been estimated and recommended. One, which is described as the "deep-cut" plan, provided for a channel six feet below the water level of Lake Michigan, and contemplated the maintenance of a channel sixty feet wide at the top and forty feet at the bottom and a depth of six feet, supplied by the direct flowage of water from Lake Michigan. The cost of the canal under the deep-cut plan was estimated at more than $10,000,000. This excess in cost over the available funds led to the consideration and adoption of the "shallow-cut" plan, which provided for a channel twelve feet above the water level of Lake Michigan, and contemplated to supply the channel with water by feeders from the Calumet or Desplaines river. Up to the first of January, 1839, the gross expenditures on the canal derived from loans and the sale of lands and lots amounted to $1,400,000. All of the canal, except about twenty-three miles between Dresden and Marseilles, was under contract, and the jobs let were roughly estimated at $7,500,000. In this situation the legislature directed the commissioners to borrow $300,000 and the Governor to make a further loan by the sale of $4,000,000 of State bonds. These bonds were disposed of to irresponsible parties, some of whom paid a portion, others practically nothing, so that the State lost several hundred thousand dollars in the sale of these bonds.

On February 26, 1839, the General Assembly passed an act which is of special importance in this connection, since it is upon this act appellant rests its claim of title to the bed of the river at the point where the proposed dam is located. Section 1 of the act of 1839 provided that the sales of canal lands and town lots heretofore authorized by law shall be regulated as follows: Under the title of "conditions of sales" it was provided: "In all sales of lands and lots under the provisions of this act the following conditions shall be annexed and shall compose part of the contract." By condition 9 it is provided as follows: "That

no stream of water passing through the canal lands shall pass by the sale so ·as to deprive the State from the use of such water, if necessary·to supply the canal, without charge for the same." Condition 11 is as follows: "Lands situated upon streams which have been meandered by the surveys of public lands of the United States shall be considered as bounded by the lines of those surveys and not by the stream." At the time this act was passed the State of Illinois owned the land on both sides of the Desplaines river where the dam in question is located. If the title to this land·had passed out of the State under the act of 1839 there would be much force in appellant's contention that the riparian owners would only obtain title to that portion of land within the meander lines, the effect of which would be to reserve the title to the bed of the stream in all odd numbered, sections bordering upon either side of the river in the State, and this, as we understand, is appellant's position.

The proposed dam is located in the south-east quarter of section 25, township 34, range 8, east of the third principal meridian, in Grundy county. Section 25 was one of the sections embraced in the government grant of 1827. Both parties concede that the title to the bed of the stream passed to the State under the government grant. The point at issue between the parties is whether such title passed out of the State when it sold said south-east quarter of section 25, or whether the grantee only took title to the meander line, as is provided by condition 11 in the act of 1839.

Returning again to the further history of the canal, we find that, owing to the panic of 1837 and the general shrinkage of values, the State was seriously embarrassed and its credit impaired. At this time $1,000,000 of State bonds bearing six per cent interest were sold in London for eighty-five cents on the dollar. In 1841 the State defaulted in the payment of interest on her public debt and her financial embarrassment became alarming. The situation was greatly aggravated by the collapse of the State banks, in

1842.   The State refused to take State bank paper for taxes, and the tax-payers did not have coin or the means of procuring it.   There was a general stagnation in business and values rapidly declined.   The State at that time owed $14,000,000, on which it was unable to pay interest. Repudiation was openly advocated, and for a time "the fair name of Illinois became freely associated with dishonor." There was a crisis in the affairs of the State as well as in the affairs of the projected canal.   Strange as it may seem, the Illinois and Michigan canal, in aid of which the credit of the State had been pulled down, was now confidently looked to as the only means of lifting it up.   It was argued the advantages and facilities to be afforded by it would cause immigrants and wealth to pour into the State.   To meet the dire situation and to insure the completion of the canal, Justin Butterfield, of Chicago, first suggested the idea of inducing the holders of canal bonds to advance the money for its completion upon the pledge of the canal, its lands and revenues to the bondholders in the nature of a first mortgage, and Gov. Ford recommended the adoption of this plan in his first message to the General Assembly.   Accordingly, on February 21, 1843, the legislature passed an act authorizing the Governor to negotiate a loan of $1,600,-000 solely on the credit and pledge of the canal property, its tolls, revenues and lands, for a term of six years, bearing six per cent interest.   Said act provided that the holders of canal bonds and other evidences of indebtedness of the State, for the purpose of aiding in the construction of the canal, should be first entitled to subscribe for said loan in proportion to the amount held by the several creditors.   It was provided in said act that a board of canal trustees should be appointed, to be known and designated as the "Board of Trustees of Illinois and Michigan Canal," one of whom should be appointed by the Governor and the other two elected or appointed by the subscribers to the said loan.   Section 10 of said act provided that for the

purpose of placing in the hands of the trustees full and ample security for the payment of said loan, and the interest thereon, and for the purpose of securing a preference in the payment of the debts held by the persons who would subscribe for the new loan, the "State does hereby irrevocably grant to the said board of trustees of the Illinois and Michigan canal the bed of the said Illinois and Michigan canal and the land over which the same passes, including its banks, margins, tow-paths, feeders, basins, right of way, locks, dams, water power, structures, stone excavated and stone material quarried, purchased, procured or collected for its construction, and all the property, right, title and interest of the State of, in and to the said· canal, with all the hereditaments and appurtenances thereunto belonging or in anywise appertaining, and also all the remaining lands and lots belonging to the said canal then or which hereafter may be given, granted or donated by the general government to the State to aid in the construction of said canal, and the buildings and erections belonging to the State thereon situated; the said board of trustees to have, hold, possess and enjoy the same as fully and absolutely, in all respects, as the State now can or hereafter could do, for the uses, purposes and trusts hereinafter mentioned." The only property excepted from this act were "all canal lands and lots heretofore sold by the board of commissioners upon which moneys are now due or may hereafter become due," which were reserved to the State. After considerable delay and difficulty the creditors of the State finally advanced $1,600,000 on the faith of the act of 1843, and the final completion of the canal was at last an assured fact.

On June 26, 1845, Thomas Ford, as Governor of the State of Illinois, executed a deed to William H. Swift, David Leavitt and Jacob Fry, trustees of the Illinois and Michigan canal, under authority vested in him by section 21 of the act of 1843, conveying to said trustees, in the language of said act, all of the canal property which the State

then owned, including "the lands and lots remaining unsold, donated by the United States to the State of Illinois to aid in the completion of the said canal, * * * to have, hold and enjoy the said property, with the right of controlling, managing, selling and disposing of the same." There is no restriction in the act itself, or in the deed made by the Governor under it, which lends support to appellant's claim that the bed of the river was reserved to the State.

On October 22, 1860, the canal trustees sold and conveyed to Charles E. Boyer, for a consideration of $1556, 196.61 acres of land in section 25, township 34, range 8, in Grundy county, and by *mesne* conveyances the title of said tract is now vested in appellee. The proposed dam is located wholly on this tract. Conveyance to Boyer was made by the canal trustees "under authority vested in said board by an act of the legislature of the State of Illinois of February 21, 1843, entitled 'An act to provide for the completion of the Illinois and Michigan canal and for the payment of the canal debt,'" which authority is recited in the face of the deed itself. The granting clause of said deed is as follows: "In consideration thereof and the premises, said board of trustees of the Illinois and Michigan canal has granted, bargained and sold, and by these presents do grant, bargain and sell, to the said Charles E. Boyer, the said tract of land above designated and described." The following is the *habendum* clause of the said deed: "To have and to hold the same, together with the rights, privileges, immunities and appurtenances thereunto belonging, unto the said Charles E. Boyer, his heirs and assigns forever." There are no exceptions, limitations, reservations or conditions in this deed. If the title to the bed of the stream did not pass by this deed it is because the trustees had no power to convey it.

Under the government grant of 1827 the State obtained title to all of section 25, including the bed of the river through that section. By the act of 1843, and the deed of

the Governor made thereunder, the title to all of the unsold portion of said section passed to the trustees of the Illinois and Michigan canal, and by their deed the title to the southeast quarter of said section on which the dam is located was vested in Boyer, and his title, as we have seen, now rests in the appellee. Under well established rules of law these several conveyances carried the title to the bed of the stream, in the absence of any language clearly denoting an intention of stopping at the edge of the river. (*Braxon* v. *Bressler,* 64 Ill. 488; *Davenport Bridge Railway Co.* v. *Johnson,* 188 id. 472.) There is no difference in the application of this rule between navigable water-courses and those which are not navigable. In grants upon navigable waters above tide waters the riparian owner takes title to the thread of the stream, subject to an easement in the public for the purpose of navigation, while as to the waters not navigable the title to the bed of the stream passes absolutely, free from any burdens in favor of the public. (*Washington Ice Co.* v. *Shortall,* 101 Ill. 46.) Where a riparian proprietor owns the land on both sides of a river, he is the owner of the whole of the bed of the stream to the extent of the length of his lands upon it. (Angell on Water-courses, sec. 5.) This is the rule of the common law, which has been adopted in this State and applied by this court to the Mississippi river in *Middleton* v. *Pritchard,* 3 Scam. 510; to the Rock river in *Braxon* v. *Bressler, supra;* to the Chicago river in *City of Chicago* v. *McGinn,* 51 Ill. 266; to the Calumet river in *Washington Ice Co.* v. *Shortall, supra;* and to the Desplaines river in *Board of Trustees* v. *Haven,* 5 Gilm. 548, and *Druley* v. *Adam,* 102 Ill. 177. The general rule is, that when riparian estates are conveyed the owner may reserve the land under water; but the general presumption is that the purchaser's title extends as far as the grantor owns, in both tidal and fresh waters. (Gould on Waters, sec. 195, and cases there cited.) There is nothing in any of the conveyances concerning the

south-east quarter of section 25 to indicate an intention to reserve that portion of said land in the bed of the Desplaines river.  On the contrary, the language of the act of 1843, and the deed of the Governor made in pursuance thereof, is so broad and comprehensive as to preclude the State from asserting title to the bed of this stream.  Anything found in the act of 1839 manifesting an intention of the State at that time to limit sales of canal lands within the meander lines of the Desplaines river must be held inconsistent with the comprehensive language of the act of 1843 and superseded thereby.  We do not, however, mean to be understood as holding that the act of 1839 was superseded in its entirety by the act of 1843, but we do hold that as to sales made under the act of 1843 to procure money with which to pay debts created thereunder, such sales were not affected by the limitations in the act of 1839.  After the trust created by the act of 1843 was executed and the debts for which the canal properties were pledged under that act were paid and the canal properties turned back to the State in accordance with section 9 of the act of 1843, any subsequent sales of canal lands would not be controlled by the act of 1843.  The record shows that at the time the lands on which the dam in question is located were sold the debt was not fully paid, and the deed executed by the canal trustees shows by its recitals that it was made under the power conferred by the act of 1843.  Deeds made by the canal trustees under the act of 1843 to lands bordering on the Desplaines river conveyed the title to the purchaser to the thread of the stream.

Appellant also contends that since the undisputed evidence shows that the Desplaines river was meandered by the government surveyors, such meander line is the boundary of riparian proprietors.  A meander line is not a boundary line, but is designed to point out the sinuosities of the bank or shore and a means of ascertaining the quantity of land in the fraction which is to be paid for by the purchaser.

(*Whitaker* v. *McBride,* 197 U. S. 510; *Albany Railroad Bridge Co.* v. *People,* 197 Ill. 199.)    An exception to this general rule seems to be recognized where the meander line is run and monuments are erected, but in the case at bar the evidence fails to show that any monuments were erected on the meander line, hence this case falls within the general rule and not within the exception.    The State of Illinois is not the owner of the bed of the Desplaines river at the place where the proposed dam is located.

THE NAVIGABILITY OF THE DESPLAINES RIVER.—The question which has received the most exhaustive treatment by counsel relates to the navigability of the Desplaines river.    The evidence introduced upon this question fills more than one thousand printed pages in the abstract, and to its discussion counsel have devoted several hundred pages of their briefs.    If the dismissal of the bill by the court below had been without prejudice to the right of the State to renew its application for an injunction, such action on the part of the court below might be sustained because of the utter failure of appellant to prove that the construction of the proposed dam will be an obstruction to the present navigation of the river.    There is no proof that the river is now being used as a public highway for commerce.    On the contrary, the evidence not only shows that the river is not being so used, but it shows affirmatively that, owing to the presence of numerous other dams and some fifty or more bridges which span the river, it would be impossible, under existing conditions, to navigate the same.    There being at present no navigation whatever upon the river, obviously the dam in question cannot be said to be an obstruction to navigation that has no existence in fact.    But the decree of the court below dismissed the bill for want of equity, without reserving any right to the State to renew this application for relief on the ground that the dam in question was being erected in a navigable stream, and rendered a final decree based on the finding that the river is not navigable,

settling this question not only for the present but for all time to come, so far, at least, as the parties bound by this decree are concerned. We regard the question, therefore, as properly presented for our consideration on its merits.

The Desplaines river has its source in the south-eastern part of Wisconsin, and flows in a southerly direction, almost parallel with the western shore of Lake Michigan, through the counties of Lake and Cook, in this State, until it reaches a point nearly opposite the western end of Forty-seventh street, in the city of Chicago, where the river curves and takes a south-westerly course, passing the cities of Lockport and Joliet, and thence to a point in Grundy county, where it unites with the Kankakee river, thus forming the Illinois river. The entire length of the river is something over one hundred miles, but in determining the question of its navigability we will have no occasion to consider that portion of the river above Riverside, since it is not contended that that portion of the river is or ever has been navigable. The maintenance of the charge in the bill that the river is a navigable stream does not impose on appellant the burden of showing that the stream was navigable in its entirety, (*Schulte* v. *Warren,* 218 Ill. 108,) or that the navigable portion of such stream was open for use all the year round. (*Pierpont* v. *Lovelace,* 72 N. Y. 211; *Burke Co.* v. *Catawba Lumber Co.* 116 N. C. 731.) Appellant contends, and appellee seems to concede, that if it is established that the Desplaines river is navigable from Lockport to its mouth the decree of the circuit court should be reversed, even though the court might be of the opinion that the river was not navigable at any other place. We have no doubt of the correctness of this proposition as an abstract statement of the law. We will therefore confine our consideration of this question primarily to that stretch of the river, about nineteen and one-half miles in length, extending from Lockport to the mouth of the river.

241 — 21

The evidence shows that there is quite a fall in certain portions of the river between these two points. From Lockport to Joliet there is a fall of thirty feet in a distance of four and one-half miles, and from dam No. 1 in Joliet to the head of Patterson's island there is a fall of twenty-one feet in three and one-half miles. Then there is a stretch of about five miles, known as Lake Joliet, in which there is practically no fall. Below the foot of Lake Joliet the river divides and forms what is called Treat's island. Going down the river the main channel is on the left of the island, and there is a fall of nine and one-half feet in one mile. After passing Treat's island the river is again united and forms a pool or lake about one mile long in which there is very little fall. Going down the river the next stretch, at a point called Smith's bridge there is a fall of about two and seven-tenths feet in one mile. Passing the rapids at Smith's bridge another pool is encountered, called Lake DuPage, where there is a fall of two feet in three and one-half miles. In the last half mile above the mouth of the river there is a fall of three and one-half feet. It is across the lower end of this stretch that the proposed dam is located. The bottom of the river from Lockport to the dam in question, with the exception of that portion under Lake Joliet, is covered with a large number of bowlders. The bottom of Lake Joliet is soft. The evidence shows that these bowlders are of various sizes, some of them between two and three feet in diameter. Some of them are covered entirely with water, while others project slightly above the surface of the water. It is also shown that in going down the river in a skiff or any kind of boat there is great danger of coming in contact with these bowlders. The current is so strong that it is not possible to row a boat up stream over these rapids. In addition to the natural barriers already spoken of, the evidence shows that the stream is tortuous and the channel very narrow at places. The slopes in the river already given do not represent the greatest fall

that can be found in this stretch.  The evidence shows that there is near the head of Treat's island a fall of seventeen feet to the mile, and near the foot the slope is eighteen feet to the mile, and in the right-hand channel opposite Treat's island there is a space of five hundred feet in which the fall is fifty feet to the mile, and if shorter distances are taken even greater slopes than these will be found to exist. At one place near the mouth of the river there is a fall for three or four hundred feet of twenty feet to the mile.  Between the mouth of the river and Lockport there are thirteen bridges across the river, none of which have draws to permit the passage of boats, if such passage were otherwise possible.  Two of these bridges are railroad bridges, and all of them are permanent steel structures.  Above Lockport there are some forty other bridges across the stream, constructed for steam or electric railroads and for wagons. The width of the river varies greatly.  At some places it is not more than sixty feet wide, while in the widest place in Lake Joliet it is over one thousand feet wide.  The evidence shows that the depth of water in the river varies considerably in different places and also at different times in the same places.  A chart showing the gauge readings at Riverside, a point twenty-eight miles above Joliet, shows the number of days in each year during which the river was dry at this point, which indicates that there were from twenty-four days in 1890 to two hundred and thirteen days in 1895 during which the river was dry at this point.  This chart also shows the number of days during each of these years when there was a discharge of less than six inches of water at Riverside, the result of which is, totaling the number of dry days and the days showing less than a six-inch discharge, that there were from one hundred and twenty days in 1888 to three hundred days in 1901 when the river was either dry or showed less than six inches of water at Riverside.  The depth of the river during the balance of the year is not shown on this chart.  These gauge readings

also show that the dry or low periods did not occur during the same time in each year. Every month in the year is represented several times during the years covered by this chart, from which the conclusion is drawn that there were no regular periods when a given stage of water could be safely expected.

We refer to the readings on the Riverside gauge, not because of their bearing on the question of navigability at that point, but for the reason that they tend to show the natural volume of water in the channel above the points where the volume is increased by the additions made by the Illinois and Michigan canal and the drainage channel, which added from 250,000 to 400,000 cubic feet of water per minute to the river below the point of connection.

Appellant strongly contends that the rights of appellee as riparian owner are to be determined with reference to the conditions that exist since the deepening of the Illinois and Michigan canal and the construction of the sanitary district channel, by means of which the volume of water in the Desplaines river has been greatly increased. It is argued that the navigability of the river is to be determined with reference to the changed condition and not as the stream existed in a state of nature. Appellant's position, as we understand it, is this: Assuming the stream to be unnavigable in its natural condition, the State may by artificial means so change the stream as to make it navigable and thus destroy the vested property rights of riparian owners upon the said stream. This position is untenable. The property rights of riparian owners in the bed of an unnavigable stream are as sacred as any other property right, and such owners cannot be deprived of those rights, without compensation, by artificial additions to the waters of the stream whereby it is rendered navigable. To hold that the State can by artificial means make a stream navigable which in a state of nature was not navigable, and thereby deprive riparian owners of their property rights in the bed of the

stream, is simply to hold that private property may be taken or damaged for public use without compensation.

The contention of appellant upon this question is contrary to the authorities. In *Thunder Bay River Booming Co.* v. *Speechly,* 31 Mich. 36, the court, speaking by Judge Cooley, upon this question said: "No such inference is warranted by the decisions. The highway they recognized is one *sui generis* and in which the public rights spring from peculiar facts. It is a public highway by nature, but one which is such only periodically and while the natural condition permits of a public use. * * * But at periods when there is no highway at all there is no ground for asserting a right to create a highway by means which appropriate or destroy private rights. The doctrine that this may be done without compensation to parties injured is at war with all our ideas of property and of constitutional rights. The most that can be said of this stream during the seasons of low water is, that it is capable of being made occasionally navigable by appropriating for the purpose the water to the natural flow of which the riparian proprietors are entitled. It is highly probable, in view of the large interests which are concerned in the floatage, that the general public good would be subserved by so doing, but this fact can have no bearing upon the legal question. It is often the case that the public good would be subserved by forcing a public way through private possessions, but it neither should be nor can be done, under any circumstances, without observing the only condition on which it can be permitted in constitutional government, namely, that the private proprietor be compensated for the value which he surrenders to the public."

In *Druley* v. *Adam, supra,* this court, in speaking of the added volume of water to which the proprietors of the Haven dam were entitled by reason of the deep cut in the Illinois and Michigan canal, said (p. 206): "It may be quite true that appellee has now more water than he had

before the deepening of the Summit level, and that contrasting his condition now with his condition then he is not injured, but he is entitled, by virtue of his position as lower proprietor, as has been shown, to the benefit of all improvements whereby the flow of the water in the river is increased, and this property right cannot be taken from him without his consent. The right which the lower riparian proprietor has to avail himself of all benefits resulting from improvements by upper riparian proprietors is obviously a property right growing out of the nature and necessities of flowing water and his position upon the stream, and of which, therefore, he can no more be deprived, without his consent, than of any other property right."

The rule that the navigability of the stream is to be determined with reference to its natural condition is supported by numerous other authorities: *Hall* v. *Lacy,* 3 Grant's Cas. 264; *Carter* v. *Thurston,* 58 N. H. 104; *Lewis* v. *Coffee County,* 77 Ala. 190; *Stratton* v. *Currier,* 81 Me. 497; *United States* v. *Rio Grande Dam and Irrigation Co.* 174 U. S. 690; *In re Ball,* 10 Wall. 557; *In re Montello,* 20 id. 431.

We are aware that there is a line of cases which at first blush may appear to be in conflict with the rule laid down in the authorities above cited. While the rule is well founded, both upon reason and authority, that a stream not navigable in its natural condition cannot be made so by artificial means, so as to deprive riparian owners of vested rights without compensation, it is equally well established that a stream which is, in fact, navigable in its natural state may be improved for the purpose of enlarging its usefulness, and the public will have a right to the enjoyment of the easement in its enlarged condition. It is to this principle that the cases of *Schulte* v. *Warren, supra,* and *Mendota Club* v. *Anderson,* 101 Wis. 479, and other like cases relied on by appellant, are to be referred. There is nothing in this line of decisions that is in conflict with the rule stated

above or the authorities cited in support thereof. In view
of the constitutional inhibition against the taking or dam-
aging of private property for public use without compen-
sation, the rule must, of necessity, be that the State cannot
directly by its own act or indirectly through the act of any
of its agents change an unnavigable stream to one that is
navigable, and thereby destroy or damage the private prop-
erty rights of adjacent owners, without making compensa-
tion. The State can no more establish a waterway over
private property without compensating the owners than it
can build a railroad or a public highway over farm lands
without paying for the right of way and all damages to
property not taken. The same constitutional provision that
protects property rights in real estate above the water line
of an unnavigable stream extends to and protects that which
is below the water, guaranteeing the same full measure of
enjoyment to the owner in the one case as well as in the
other. This view is supported by the decision of this court
in *City of Chicago* v. *Laughlin,* 49 Ill. 172, where, on page
177 of the opinion, the following language is used: "It
would be monstrous that the city should, at pleasure, make
changes in this stream so as to render buildings on the
wharves an obstruction and then require their removal with-
out compensation. Such power would be more vast and
absolute than can be exercised by the State itself. The city
government is created and has its powers delegated for the
better protection of individual rights, and not that they may
be disregarded or destroyed."

The widening or deepening of navigable streams, or the
improvement of those which are not navigable so that they
may become so, or the construction or improvement of har-
bors, are works of a public nature, conferring benefits on
the public at large. Such improvements may be made and
paid for out of the general treasury, from funds raised by
taxation. The Supreme Court of the United States, in
*County of Mobile* v. *Kimball,* 102 U. S. 691, decided that

the State might authorize a county to improve a public harbor, to be paid for by bonds which were ultimately to be paid by general taxation upon property of the county. (See Page & Jones on Taxation by Assessment, sec. 360.) But under the law of this State as laid down in *City of Chicago* v. *Law,* 144 Ill. 569, a navigable stream cannot be improved and the cost thereof levied by a special assessment upon the real estate fronting upon such water-course. In that case an attempt was made by the city of Chicago to improve the south branch of the Chicago river and to charge the cost of such improvement by a special assessment against the lands and lots fronting on the same, and this court, in denying the power of the State to make such improvement by a special assessment, on pages 576 and 577, said: "The river is a navigable stream of the United States. It connects with Lake Michigan, and by means of the lake with the country at large. The Federal government has assumed jurisdiction over it, and expended money, as appears from the admitted facts, for its improvement. It is one of the channels over which the commerce of the country passes, and this improvement was instituted for the purpose of increasing its power as one of the navigable streams of the country. It was undertaken in the interest of the commerce of the country. Was it ever intended that a few land owners bordering on one of the navigable streams of the country should be compelled to pay for an entire improvement in a river, the object of which is to benefit the public at large rather than the locality where the improvement is made? Here the contemplated improvement was one to widen the river in order that boats and vessels might pass up and down the river with greater facility,—one calculated to increase the navigable qualities of the river,—an enterprise wholly public in its nature. If one of the cities located on the banks of the Mississippi river should undertake to remove obstructions from that navigable stream of water to enable boats to run up and down the river with greater

facility and pay for the improvement by special assessment on property fronting on the river, it would not, we apprehend, be contended that an assessment of that character could be sustained under the provisions of the statute above cited; and yet there is no substantial difference between the supposed case and the one under consideration. The proposed improvement has none of the elements of a local improvement, such as incorporated towns and cities have been in the habit of making by special assessment."

If riparian owners cannot be specially assessed to pay for the improvement of a navigable stream, *a fortiori* they cannot be required to surrender valuable property rights, without compensation, in furtherance of a scheme to improve one that is not navigable in its natural condition. Much time and labor have been spent by appellant in presenting reports of surveys, maps and engineering schemes for the improvement of this river, which, if carried out, would render the river navigable. But all this is not pertinent to the issue. The question is whether the river was navigable in a state of nature, and not whether it can be made so by artificial means.

It is also contended that the Sanitary District act declared this river to be navigable. This contention is based on a sentence in section 24 of said act, as follows: "When such channel shall be completed, and the water turned therein, to the amount of 300,000 cubic feet of water per minute, the *same* is hereby declared a navigable stream." Appellant's contention, under this statute, is thus stated in its brief: "The *same* means that the water flowing in that channel is a navigable stream. The water so turned in was navigable in fact, and it does not lose its navigability in passing out of the artificial channel into the channel of the Desplaines river. The water is just as navigable one-half mile south-west of Joliet as it is one-half mile north-east of Joliet." The argument is based upon an erroneous con-

struction of the word "same." That term refers to the channel of the sanitary district and has no reference to the water after it leaves the channel.

But even if the legislature had declared, in unequivocal language, that the Desplaines river was navigable, as it did by the act of 1907, such declaration could not have the effect of depriving appellee of vested rights as riparian proprietor, if such rights exist. The general doctrine upon this question is well expressed by the Supreme Court of Kentucky in *Murray* v. *Preston,* 106 Ky. 561, (90 Am. St. Rep. 232,) as follows: "The first question is, what is the effect of the act of the legislature declaring this creek a navigable stream? The constitution of the State forbids private property being taken for public use without just compensation being previously made. If the creek was not a navigable stream when this act was passed it was the private property of the owners of the adjoining lands. If it was the private property of appellant within the boundary of his land, the legislature could not divest him of his rights by simply calling it a navigable stream when it was not one in fact. The rule on this subject is thus stated in Cooley cn Constitutional Limitations (side p. 591): 'The question what is a navigable stream would seem to be a mixed question of law and fact, and though it is said that the legislature of the State may determine whether a stream shall be considered a public highway or not, yet if, in fact, it is not one the legislature cannot make it so by simple declaration, since if it is private property the legislature cannot appropriate it to a public use without providing for compensation.' " And the same doctrine is announced in the following cases: *Walker* v. *Board of Public Works,* 16 Ohio, 540; *Morgan* v. *King,* 35 N. Y. 454; *Shenango Bridge Co.* v. *Paige,* 83 id. 178; *Martin* v. *People,* 5 Blackb. 35; *Olive* v. *State,* 86 Ala. 88; *People* v. *River Mill and Lumber Co.* 107 Cal. 221; *Yates* v. *Milwaukee,* 10 Wall. 497; *Watkins* v. *Dorris,* 54 L. R. A. 199.

None of the legislative acts relied upon by the appellant were passed for the primary purpose of promoting deep water navigation from the lakes to the gulf by means of improving the channel of the Desplaines river. The various acts passed in the interest of the Illinois and Michigan canal, as well as the Sanitary District act, did not include any general scheme for the improvement of the Desplaines river. Up to this time no general plan for the deep water-way has been adopted, either by the State or the nation. Whether such enterprise will ever be attempted by either, separately or by the joint action of both, and, if such enterprise is entered upon, whether the plan will embrace the use of the old Illinois and Michigan canal or the sanitary district channel in connection with a part of the Chicago and Desplaines rivers or whether some new and entirely different channel will be adopted, are all legislative questions, with which the courts have no concern. Figuratively speaking, the waters have been much troubled on this subject, but so far neither the nation nor the State has legislated how they shall flow. What the future will see accomplished along these lines no one can know. It may be that when that future is unfolded it will bring a realization of the hopes of the most optimistic, and that the appearance of sea-going vessels plowing through the prairies of Illinois, laden with the people and products from the uttermost parts of the earth, will be as common as the now almost forgotten "prairie schooners" of 1849 were in those days. But if this transition is to occur,—if the powerful hands of the government are to lay hold of this gigantic enterprise,— due regard must be had to the sacred rights of every citizen, however humble and insignificant those rights may seem in contrast with the great public consummation.

What is a navigable stream is a question to which different courts have given different answers. In some of the States, where the lumber business was of great importance and the floating of saw logs an essential branch thereof, a

stream that had the capacity for floating logs, though only for short periods in times of freshets, was held to be navigable. (*Brown* v. *Chadbourne,* 31 Me. 9; *Moore* v. *Sanborne,* 2 Mich. 519.) But these cases, and the reasons upon which they rest, were examined by this court in *Hubbard* v. *Bell,* 54 Ill. 110, and their authority expressly rejected. In discussing that question this court, on page 122, used the following language: "It is not enough that a stream is capable, during a period, in the aggregate, of from two to four weeks in the year, when it is swollen by the spring and autumn freshets, of carrying down its rapid course whatever may have been thrown upon its angry waters, to be borne at random over every impediment in the shape of dams or bridges which the hand of man has erected. To call such a stream navigable in any sense is a palpable misapplication of the term." The doctrine of this case has been re-affirmed by this court in *Schulte* v. *Warren, supra,* and on page 119 of the latter case this court approved the following definition of a navigable stream by Lord Hale in his treatise *De jure maris:* "A stream, to be navigable, must furnish 'a common passage for the king's people,' must be 'of common or public use for the carriage of boats and lighters,' must be capable of bearing up and floating vessels for the transportation of property conducted by the agency of man." And the same definition is also approved in *Joliet and Chicago Railroad Co.* v. *Healy,* 94 Ill. 416. In the *Schulte case* it was further said (p. 119) : "A stream is navigable, in fact, only where it affords a channel for useful commerce and of practical utility to the public as such. The fact that there is water enough in places for row boats or small launches answering practically the same purpose, or that hunters and fishermen pass over the water with boats ordinarily used for that purpose, does not render the waters navigable."

A stream, to be navigable, must in its ordinary, natural condition furnish a highway over which commerce is or

may be carried on in the customary modes in which such commerce is conducted by water.   (Gould on Waters, sec. 34, and cases there cited.)   Whether the stream in question is navigable is a question of fact, the burden of proving which rests upon the party asserting it.   (*Ligare* v. *Chicago, Madison and Northern Railroad Co.* 166 Ill. 249.) To maintain this issue appellant with commendable industry has assembled every fact which appears to have even a remote bearing on the question and incorporated the evidence in the record.   Research into historical data has been made and the result presented to the court.   This class of evidence begins with the account of the first voyage of Marquette and Joliet, in 1673-74, as related by John Gilmary Shea in "Shea's Early Voyages up and down the Mississippi," published in 1700 by Burrow Bros.   Excerpts from this publication were introduced, also copies of maps made by Marquette and Joliet showing the principal features of the country explored by them.   Section 10 from a chapter from this book, entitled "The first voyage made by Father Marquette toward New Mexico, and how the idea thereof was conceived," reads as follows:

"Return of the Father and of the French.—After a month's navigation, while descending the Mississippi from the 42d to the 34th degree and beyond, and after preaching the gospel as well as I could to the nations that I met, we started on the 17th day of July from the village of the Akensea to retrace our steps.   We therefore re-ascended the Mississippi, which gives us much trouble in breasting its current.   It is true that we leave it at about the 38th degree to enter another river, which greatly shortens our road and takes us with but little effort to the Lake of the Illinois. We have seen nothing like this river that we enter, as regards its fertility of soil, its prairie and woods, its cattle, elk, deer, wild oats, bustards, swans, parroquets, and even beaver.   There are many small lakes and rivers.   That on which we sailed is wide, deep and still for sixty-five leagues.

In the spring and during part of the summer there is only one portage of half a league. We found on it a village of Illinois, Kaskaskia, which consists of seventy-four cabins. They received us very well and obliged me to promise that I would return and instruct them. One of the chiefs of this nation, with his young men, escorted us to the Lake of the Illinois, whence at last, at the end, we reached the bay Des Prantz, from which we·had started at the beginning of June."

This account indicates a reasonable probability that Father Marquette went up the Mississippi river, turned into the Illinois, thence up the Illinois to the mouth of the Desplaines, and up that river to a point where a portage was made to the south branch of the Chicago river, thence into the Lake of Illinois, (Lake Michigan,) and this probability is strengthened by the maps introduced, which show that these rivers, together with the portage between the Desplaines and the Chicago, were known at that time. The boats in which these voyages were made are described in the following passage: "We were not long in preparing all our equipment, although we were about to begin a voyage the duration of which we could not foresee. Indian corn, with some smoked meat, constituted all our provisions. With these we embarked,—Monsieur Jollyet and myself, with five men,—in two bark canoes, fully resolved to do and suffer everything for so glorious an undertaking."

A passage from "Indian Antiquities," by Schoolcraft, is introduced, which recites that in 1783 Jean Baptiste Perrault, a fur trader from Montreal, spent a year in Cahokia and returned by way of Chicago with a canoe and a barge loaded with furs. The passage referred to is as follows: "About the 15th of April the packs from Missouri arrived. Our bourgeois settled his accounts with M. Coteau and received seventy-four packs of furs. His retail store at Cahokia produced 500 Spanish· dollars and 400 pounds of tobacco. We left Cahokia on the 4th of May for Macki-

nac.  My directions were to pass by Chicago, having one barge and one canoe, and to await the arrival of M. March- isseaux at Little Detroit, in Lake Michigan, he having gone by the way of Prairie des Chiens to terminate his business with the Sauks.  After fourteen days' detention he arrived, and continuing our route we reached Mackinac the begin- ning of July, where I found myself at liberty."

A manuscript not very well authenticated was intro- duced, which shows that Hugh Heward, in May, 1790, made a voyage from Lake Michigan through the Chicago river and over the portage road to the Desplaines, and down the Desplaines and Illinois to some point (probably Kas- kaskia) on the Mississippi river.  This document records the fact that after passing over the rapids above the village of Mt. Julliette two of his comrades informed Heward that "there was so much danger they would not return with Heward."  The character of the boats and cargo is not de- scribed, but neither could have been very heavy, since the boats and cargo were carried over the portage from the Chi- cago river to the Desplaines by Heward and his two com- rades with the help of five Indians, whose services were paid for with two handfuls of powder.

There are other historical references to the route by way of the Chicago and Desplaines rivers to the Missis- sippi, but these are the only well authenticated voyages that were made during the first one hundred and fifty years after the discovery of the Desplaines river.  The fact that during this long period only an occasional voyage was made under the guidance of a heroic adventurer or a religious zealot, who, in the language of Marquette, "feared no death and regarded no happiness greater than that of losing his life for the glory of Him who made us all," is not suf- ficient evidence to prove that the Desplaines river was, in fact, regarded as navigable by the great majority of the people who must have been acquainted with it during this period.  It rather tends to show that the few who possessed

the courage to brave the dangers incident to a voyage over the rocky rapids of the Desplaines were exceptional cases, and that the great body of the people living in the vicinity of this river did not regard the navigation of the river as reasonably safe and therefore made no use of it. There is not in this entire record a well authenticated instance in which a boat engaged in commerce navigated the waters of the Desplaines river. It seems pertinent to inquire, if the Desplaines river is navigable why has it not been navigated? If the Desplaines river was navigable, why did the State of Illinois spend $10,000,000 in the construction of the Illinois and Michigan canal, which parallels the Desplaines river? The conclusion is irresistible that in the opinion of the legislature the Desplaines river was not only not navigable in its natural condition, but that the natural obstructions were such that it was cheaper to construct a navigable canal than to remove the difficulties out of the natural channel. Appellant's answer to the last question above stated is, that the Illinois and Michigan canal was extended beyond the point where it might have intersected the Desplaines river in order to obtain as large a grant of land as possible from the Federal government. This answer discredits the intelligence of Congress and reflects on the honor of the State. We are unwilling to believe that the State would have asked for, or that Congress would have granted, lands to aid in the building of a canal that was not needed. The Chicago river was used as a part of the canal at its northern end, and had it been practicable to do so, it is reasonable to believe the Desplaines river would have been used at the other end.

A large number of witnesses testified, some from personal observation and others as experts, upon this issue. As might be expected, these witnesses testify to opposite opinions in regard to the navigability of this river. It is not practicable nor desirable to discuss this evidence in detail. Whatever may be thought of the preponderance of it

one way or the other, it can have but little weight as against the uncontroverted fact that the river has never been used as a public highway for commerce. During the early part of the history of the Mississippi valley, and before railroad transportation came into general use, all of the navigable rivers in the settled portion of the country were extensively used. The necessities of the early settlers compelled them to use the means of transportation that nature afforded them. Before steamboats were in general use, farm products were floated down the Mississippi river and all of its tributaries in flatboats. The Sangamon, Illinois, Wabash and Ohio rivers were thus extensively used. Had it been possible to do so, it seems but reasonable that the Desplaines river would have been used in the same way by the early settlers, but the evidence of any such use is not found in this record. The evidence shows that as early as 1817 there was a well-beaten wagon road from the mouth of the Desplaines river to Chicago, over which boats and other loads were hauled by oxen and vehicles kept for that purpose by the French settlers at Chicago. The evidence of the existence of this road is found in a report by R. Graham and Joseph Phillips made to Hon. J. C. Calhoun, Secretary of War, and is dated "Kaskaskia, Aprul 4, 1819." The testimony of the early settlers is, that they came in and went out of Chicago by wagon road. In 1836 the New York and Oswego Transportation Line advertised in the *Chicago American* of May 14, 1836, that goods would be transported from New York to St. Louis. One link in the line of transportation was by "wagons from Chicago to the head of navigation on the Illinois river." And in the same paper a passenger line was advertised from Chicago to Peoria, which was by a mail stage leaving Chicago daily for Peoria, making the trip of 170 miles in "from thirty to thirty-five hours by steamboats and stages,—stages from Chicago to Peru and steamboats from Peru to Peoria. Fare, the whole distance, $11, and found on board the

boat. This line passes through Lockport, Juliet, Ottawa and Utica, to Peru." All of the witnesses who testified to the mode of transportation before the opening of the Illinois and Michigan canal, in 1848, testify to the general custom that prevailed along the line of the Desplaines river of hauling grain and other produce by wagon to Chicago, and some of them say that it was not uncommon in those days for wagons to go to Chicago from points as far south as Bloomington.

Appellant has introduced, for the purpose of comparison, descriptions of other rivers which have the same or similar natural obstructions that are found in the Desplaines river, notwithstanding which such other rivers have been held to be navigable. Evidence of this character was introduced in regard to the Mississippi, Fox, Wisconsin, Ohio, Kanawha, Cumberland, Missouri, Gasconade, Allegheny, Tennessee, Sangamon, Columbia and Snake rivers. To review all this evidence would extend this discussion to un-- reasonable bounds. We are not strongly impressed with the line of reasoning that is based upon this class of evidence. There are no two rivers exactly alike, and it will be found that most, if not all, of the rivers referred to as standards of comparison contain a long strip of navigable water, which is of sufficient length and importance to justify commerce in devising methods to overcome the natural obstructions. This is not true of the Desplaines river. There are no navigable portions of this river of sufficient length to make navigation profitable thereon. After the most careful consideration of this question we are of the opinion that the Desplaines river in its natural condition is not a navigable stream, and that the rights of parties to this suit must be determined upon that basis.

THE VALIDITY OF THE CONTRACTS.—*The flowage contract.*—The third ground upon which appellant rests its right to an injunction is the alleged invalidity of certain contracts entered into between the commissioners of the Illi-

nois and Michigan canal and certain parties who have transferred all their interest in said contracts to appellee. In order to properly understand the questions involved in regard to these contracts it will be necessary to state some facts which we have not heretofore referred to.

At the point where the dam is located the Illinois and Michigan canal parallels the Desplaines river. The two water-courses are separated at this point by an artificial embankment erected by the State in the construction of the canal. The canal is on the right side of the river, and still to the west of the canal arise steep bluffs, which are known as "Dresden Heights." On the left side of the river the triangle of land between it and the Kankakee is low and flat. The canal is elevated by means of an artificial embankment. This embankment has a trench in the top, carrying the Illinois and Michigan canal. The left-hand side of the embankment slopes toward the Desplaines river. On this side of the canal there is a level space a few feet wide at the crest of the embankment, which is called the towpath. The sloping embankment of the canal extends up the canal. Appellee's purpose is to construct a dam across the Desplaines river so that the right-hand end thereof will rest against the sloping side of the canal embankment, thus forming a pool of water above the dam which will at its extreme height be twenty-four feet above low-water mark in the Desplaines river at the dam. The pool of water thus formed will extend several miles up the river, one side of which will rest against the canal embankment. At the point where the dam is located the canal embankment is approximately twenty-four feet above the level of the water in the river. The base of the canal at this point is about seventy feet in width, and the left bank next to the river is from twelve to fourteen feet in width at the top. From the base of the canal the ground slopes gradually to the river, which is about seven hundred feet distant. Appellee's intention is to raise the water in ordinary stages to an

elevation about seven feet lower than the top of the tow-path bank.    About one-half mile up the river from the dam is the southern extremity of a narrow strip of land between the canal bank and the river, which is designated in the record as the "sixteen-acre tract."    This sixteen-acre tract is low and marshy, and is bounded on the one side by the Desplaines river and by the canal on the other.    It is in section 31, township 34, north, range 9, east of the third principal meridian, in Will county, and is a part of the lands granted by Congress to the State to aid in the building of the canal and still belonged to the State when the flowage contract was made.    The effect of constructing this dam will be to flood this sixteen-acre tract.

Appellant contends that the contract executed September 2, 1904, by the canal commissioners to Harold T. Griswold, designated in the record as "the flowage contract," is void and should be so declared by the court.    This contract recites, that whereas the said Griswold, party of the second part, claims to be a riparian owner along the Desplaines and Illinois rivers, in Grundy and Will counties, and is, as such riparian owner, about to improve the Desplaines river by the construction of a dam and other works across the mouth of said river, with a crest of such height that the pool formed thereby will be on a level with the waters of Lake Joliet, and is about to improve the Illinois river by deepening the channel of said river in section 25, township 34, north, range 8, east; and whereas, the State of Illinois is a riparian owner at different points on the Desplaines and Illinois rivers within the territory covered by this contract, and is the owner of certain described parcels of land under the control of the canal commissioners and which are not connected with a water power upon the Illinois and Michigan canal, which said riparian rights of the State have never produced a revenue, and the land is swampy, partially covered with water, and said lands are so situated that they cannot be made available by the State

to create water power, and the party of the second part is desirous of obtaining the right to use, overflow and damage (not, however, in a manner to interfere with navigation on the Illinois and Michigan canal,) so much of the property of the State as may be necessary in the construction of said dam and other works in the improvement of said Desplaines river and in the deepening of the channel of the Illinois river, therefore, in consideration of these premises and the sum of $2200, the receipt of which was acknowledged, the parties entered into a contract, the substance of which is as follows:

The said contract purports to give the consent of the commissioners of the Illinois and Michigan canal to the construction of a dam across the mouth of the Desplaines river, with a crest at an elevation not to exceed minus 73.2 Chicago datum, which dam shall not back the water beyond the northern limits of Lake Joliet, and to deepen the channel of the Illinois river at certain points; and gives the right and authority to Griswold to flow the ninety-foot reserve strip through certain sections of land by the canal bank, and to flow such of the lands in the north fraction of section 31, township 34, as lie south of the ninety-foot strip along the tow-path side of the Illinois and Michigan canal, where the same may be overflowed by reason of the construction of said dam, together with a right to flow the water up against the tow-path bank of the canal, subject to certain conditions and specifications therein provided, intended to protect and preserve the canal and the tow-path bank thereof. The contract authorizes Griswold to attach one end of the dam to the tow-path bank of the canal, but not so as to interfere in any manner with the use of said tow-path in connection with said canal. The contract also authorizes Griswold to excavate in and remove so much of the Kankakee feeder (an abandoned feeder of the Illinois and Michigan canal) as may be necessary to discharge the waters of the Desplaines river through said

feeder in a proper manner, and to remove the old aqueduct piers belonging to said feeder in the Desplaines river. The contract further provides that Griswold shall have the right to turn and avert water from the Desplaines river into the Kankakee river through a certain stream of water called the "Kankakee cut-off," through and over the Kankakee feeder and the ninety-foot strip on each side of the feeder, in section 25, township 33, range 9, and to construct controlling gates on the banks of said feeder for flood protection from the Kankakee river. Clause 6 of said agreement is as follows: "It shall be the duty of said party of the second part, subject to the direction of the canal commissioners or other officer or agent, as hereinafter indicated, to raise the tow-path or bank of the Illinois and Michigan canal from its present height not less than two feet, and to any additional height that may be necessary to prevent overflow, and to *perpetually* thereafter maintain the same in good condition. The raising of said tow-path shall extend from the point in said Grundy county where the dam or other structure of said party of the second part intercepts said tow-path bank to lock No. 7, in section 17, township 34, north, range 9, east of the third principal meridian, and when raised, the width of the top of the tow-path bank shall conform to the width of the tow-path as it exists at the present time." By the eighth clause of said contract permission is given to Griswold to use so much of the gravel or other material lying along the canal and belonging thereto as may be necessary to raise the tow-path bank as is provided in the sixth clause, such material, however, to be taken from places indicated or approved by the superintendent of the canal. Permission is given to enter upon the lands and premises of the State for the purpose of constructing said dam and raising the tow-path and for making necessary repairs to the same. Griswold covenants to raise certain buildings owned by the State and used in connection with the canal to a level with the tow-path, as pro-

vided in paragraph 6 of said contract, and to provide two acres of land to be used by the State as a garden in connection with said buildings.   It is provided and stipulated that all of the work to be done under said contract which shall affect the canal property or interest shall be done under the supervision of and to the satisfaction of the canal commissioners or other duly authorized agents, and not otherwise, and that such work, when completed, shall at all times be kept and maintained by said Griswold under a like supervision and approval of the canal commissioners, and that all costs of inspection shall be borne by said Griswold, who is, under the terms of said agreement, to be held responsible for all damages that may be sustained by the State or the canal commissioners, or the persons or property of persons using the Illinois and Michigan canal, or that may be occasioned by the construction of the works contemplated to be done or in the subsequent repair and maintenance thereof under said contract.   Said contract, and all the provisions thereof, are by its terms made obligatory upon the successors and assigns of said Griswold.

The Kankakee feeder is an artificial channel which was constructed upon the right side of the Kankakee river, commencing a few miles above the confluence of the Kankakee and Desplaines rivers and running in a north-westerly direction, almost parallel with the Kankakee river, to a point where the feeder intersects the Desplaines river, a distance of some three-quarters of a mile ·above the mouth of the Desplaines.   The purpose of this feeder was to supply water to the Illinois and Michigan canal prior to the lowering of its summit level, after which the canal was supplied with water from Lake Michigan.   The Illinois and Michigan canal being on the opposite side of the Desplaines river from the Kankakee feeder, it was necessary to cross the Desplaines river with this feeder in order to deliver the water into the canal.   The aqueduct and piers referred to in the flowage contract, and which Griswold is given the

right to excavate and remove, are the works that were placed in the Desplaines river for the purpose of carrying the water in the Kankakee feeder across the Desplaines river to the canal. As already stated, this feeder was rendered unnecessary after the summit level of the canal was lowered by the city of Chicago, so that the so-called Kankakee feeder has not been used for nearly twenty years prior to the commencement of this suit. It is marked "abandoned" on the map made under the direction of J. W. Woermann, United States assistant engineer. The evidence shows that the Santa Fe and Chicago and Alton railroads cross the Kankakee feeder and the ninety-foot reserve strip on either side thereof, and that the channel is filled up by the railroad embankments at the point where they cross the feeder. The Kankakee cut-off is an artificial channel connecting the Kankakee and Desplaines rivers. It taps the Kankakee river at a point near the section line between sections 5 and 6, township 33, north, range 9, east, and extends north a distance of two miles and intersects the Desplaines river about two miles above its mouth. The Kankakee cut-off crosses the Kankakee feeder near the center of the south line of section 5.

Appellant's contention in reference to this flowage contract is, that it is, in effect, a sale of the interest in the lands affected thereby, and as such it is void under the statute hereinafter referred to, because it was not made at a public offering after giving the statutory notice. It will be observed that this flowage contract is not limited to twenty years or any other specified term. The absence of such limit, and the provision in clause 6 which we have quoted above regarding the agreement of the party of the second part to perpetually maintain the tow-path or the bank of the canal in repair, form the basis for the contention that the contract is, in effect, a sale of the interest in the lands to be flooded. Numerous authorities are cited by appellant to the effect that an agreement for the perpetual flow-

age is, in effect, a sale of an interest in the land and a right of perpetual possession. Among the cases so holding in this State are *Woodward* v. *Seely,* 11 Ill. 157, and *Wilmington Water Power Co.* v. *Evans,* 166 id. 548. The authorities are numerous in other States to the same effect and the soundness of the proposition cannot be questioned.

The act of March 27, 1874, (Hurd's Stat. 1908, p. 220, *et seq.,*) under which all of the contracts in question were made, after providing in sections 1 to 7 for the appointment and organization of the board of canal commissioners, by section 8 defines the powers and duties of the said board. Said section 8 reads, in part, as follows:

"Sec. 8. Said commissioners shall have control and management of the Illinois and Michigan canal, including its feeders, basins and appurtenances, and the property thereto belonging, and all locks and dams and other improvements of the navigation of the Illinois and Little Wabash rivers, and shall have authority:  *  *  *

"*Fourth*—To sell and dispose of any machinery, fixtures, stone, debris, material or personal property unnecessary for the proper management, construction, repair or use of said canal, locks, dams, and other improvements.

"*Fifth*—To lease from time to time any of the canal lands or lots owned by the State: *Provided,* no lease shall be for a period exceeding twenty years.

"*Sixth*—To lease from time to time, to the highest bidder therefor, any water power and lands or lots connected therewith. Before any such lease shall be made, at least thirty days' public notice of the intended letting shall be given by publication in some newspaper published in the neighborhood, and such other notice as the commissioners shall deem best. The commissioners shall have power to require that bids be accompanied by security and may reject all bids not satisfactory to them, and re-advertise until they shall receive satisfactory bids. No lease shall be for a period exceeding twenty years, but the commission-

ers may provide for the extension of any lease from time to time, not exceeding twenty years at any one time, at a rent to be fixed by an appraisal, to be made by three disinterested appraisers to be appointed by the Governor, and such appraisal shall be subject to the approval of the commissioners. All leases of water power and extension thereof shall be subject to the right of the commissioners to resume, without compensation to the lessee, the use of any such water power for the purpose of the canal, and also wholly to abandon or destroy the work by the construction of which the water privilege shall have been created, whenever, in the opinion of the legislature, such work shall cease to be advantageous to the State.

"*Seventh*—To lease from time to time to the highest and best bidder (after publishing notice in some newspaper published in the county where the ice privilege to be leased may be,) in sections not exceeding one thousand feet, lineal measure, upon such terms, as not to interfere with the proper use and management of the canal, the right to take and harvest ice therefrom, or from any of its feeders, basins and appurtenances, and to prohibit all persons from taking and harvesting ice therefrom without such lease: *Provided,* no such lease shall be for a longer time than twenty years.

"*Eighth*—To sell and convey, whenever in their judgment the interest of the State will be promoted thereby, any canal lands or lots now owned by the State, and any riparian rights in and along the Desplaines river: *Provided,* they shall not sell any lands or any portion of the ninety-foot strip along the canal which are now utilized in connection with the use of the water power upon the said canal or which will prevent or interfere with the proper use and operation of the said canal as a waterway. But before making any such sale they shall obtain the approval of the Governor thereto, and to the time, place and manner of

making the same: *Provided,* that before any such sale shall be made thirty days' previous notice thereof shall be given in some newspaper published in the county where such land, lots or riparian rights are situated. And said land, lots or riparian rights shall be sold at public auction to the highest and best bidder: *Provided,* that any or all such bids may be rejected if, in the judgment of the canal commissioners the interests of the State seem to require it.

"*Ninth*—To execute in due form and deliver any conveyance that may be necessary to comply with the conditions of any bond, contract or agreement heretofore made by those lawfully authorized to sell any of the real estate known as canal lands, where the purchaser shall have complied with the conditions of such bond, contract or agreement, and the commissioners are satisfied that he is justly entitled to such conveyance."

It will be seen that under the second proviso of clause 8 of section 8 of the statute above quoted it is required that before any sale of "canal lands or lots" can be made by the canal commissioners it is necessary that they obtain the approval of the Governor and advertise such sale for thirty days in some newspaper published in the county where such lands, lots or riparian rights are situated, and that such sale can only be made at public auction to the highest and best bidder. If the flowage contract was a sale of canal lands or lots or riparian rights, then, clearly, under this statute such sale would be void, since there was no attempt on the part of the canal commissioners to comply with clause 8 in relation to the sale of canal lands and lots. By careful attention to section 8 and the several clauses thereof it will be found that the powers of the canal commissioners may be divided into two classes, as follows:

(1) Powers which may be exercised without notice, which are: (*a*) All the general powers of the commissioners given by the first sentence in section 8; (*b*) the power

to sell and dispose of personal property, as provided in clause 4; (*c*) to lease for a period not exceeding twenty years any of the canal lands and lots owned by the State.

(2) Powers which can only be exercised after public notice and at public auction, which are: (*a*) The power to lease water power and lands and lots connected therewith, as provided in clause 6 of said section 8; (*b*) the power to lease the right to harvest and take ice from the canal, as is provided in clause 7; (*c*) the power to sell and convey canal lands and lots and riparian rights in the Desplaines river, as provided in clause 8.

The commissioners have no power to sell any land or any portion of the ninety-foot strip along the canal which is now utilized in connection with the use of water power, either at public or private sale, with or without notice.

Appellant contends that this flowage contract was a perpetual license to flow certain lands belonging to the State, and is void because a perpetual license is, in effect, a sale of an interest in the land, and, regarding the contract as a sale, it cannot be upheld, for the reason that the statute in respect to sales was not complied with. There is no language in the contract showing that the parties to it intended it as a sale of any interest in the lands described therein. To give it the effect of a sale would be obviously against the intention of the parties to the contract.

Appellant contends that the contract is a sale because of the use of the word "perpetually" in connection with the duty of Griswold to keep the tow-path bank in repair. If this contract had by its terms granted the rights and privileges therein mentioned for a term of twenty years it would clearly be within the powers of the commissioners which are enumerated under division "*c*" of class 1, which are granted by the fifth clause of section 8 of the statute, unless the flowage contract should be held to be a lease of "water power and lands and lots connected therewith." If it is possible to do so, such a construction of the contract

should be given as makes the contract valid rather than one which destroys it.   No time having been stated in the contract it must be inferred that it was made with reference to the statute, and the contract should be read in the light of the statute under which the commissioners were acting. It is a well established rule that where one attempts to grant a greater estate than he has, the conveyance will be effective to pass what he has although the grant may be inoperative as to the larger estate.   Disregarding the word "perpetually," it could not reasonably be contended that the lease extended longer than the term authorized by the statute.   It will be noted that the word "perpetually" is not used to define the duration of the rights granted to Griswold, but it occurs in a clause defining the obligations assumed by Griswold.   But in our opinion the word "perpetually," as used in this contract, should not be construed as meaning "forever."   The question here is, what did the parties mean and how did they understand the term?   The word "perpetually" does not always mean "forever."   (*De-Florez* v. *Raynolds,* 8 Fed. Rep. 334; *State* v. *Payne,* 31 S. W. Rep. 797.)   This court held in *People* v. *Chicago Telephone Co.* 220 Ill. 238, and *People* v. *Central Union Telephone Co.* 232 id. 260, that a grant to a corporation of a franchise without any limitation as to duration will not be held as a grant in perpetuity but will be limited to the life of the corporation to which it was granted; and the same rule was announced by the Supreme Court of the United States in *Blair* v. *City of Chicago,* 201 U. S. 400. In the case last above cited, on page 485, the Supreme Court of the United States said: "We cannot agree that the duration of these permits would be in perpetuity because of the fact that no time was named in them.   The extension into Lake View was part of the north side railway system, which by the terms of the grants from the city were limited to twenty-five years, and no longer.   There certainly could be no intention, in granting these permits from the super-

visors as extensions of the system, to make perpetual grants when the right of user of the main part of the line was expressly limited to twenty-five years, and their inference would be, that in extending this part of the system so as to make a portion of that already granted, such grants were to be for the same term as those already made."

Reading the statute, which authorized the canal commissioners to enter into this contract for a term of twenty years, in connection with the language of the instrument, and construing the word "perpetually" in view of the statute and the context of the contract, we think it means that the rights granted to Griswold are for twenty years, and that his obligation to maintain the tow-path bank in repair is co-terminous with the rights granted to him.

That this flowage contract was not understood by the parties thereto as conveying a perpetual right to Griswold to flow the property of the State therein described is shown by the fact that on January 6, 1905, the canal commissioners sold and conveyed to Griswold the parcel of land known as the sixteen-acre tract. This sixteen-acre tract is embraced in the flowage contract. If by such flowage contract Griswold obtained the right to flow said sixteen-acre tract in perpetuity, then there would have been no reason for his paying $500 additional for a deed to said tract. This transaction shows that the parties themselves did not regard the flowage contract as a sale of an interest in the land itself. On the same day that the flowage contract was executed, and as a part of the same transaction between the canal commissioners and Griswold, a lease was executed of the ninety-foot reserve strip along the tow-path of the canal, describing said ninety-foot strip in the same way that it is described in the flowage contract, which said lease is for a term of twenty years from said second day of September, 1904. The lease was a general lease, in consideration of $500. It is not stated in said lease what use is to be made of said ninety-foot reserve strip.

It is a familiar rule of construction that where different instruments are executed between the same parties and. relating to the same subject matter, all of the instruments should be construed together in determining the real intention of the parties.   This rule has often been applied by this court.   (*Canterberry* v. *Miller,* 76 Ill. 355; *Wilson* v. *Roots,* 119 id. 379; *Gardt* v. *Brown,* 113 id. 475.)   Applying this rule to the flowage contract and the lease of the ninety-foot strip, which also included the sixteen-acre tract, we have this situation:   The canal commissioners leased to Griswold certain portions of the ninety-foot reserve strip, the sixteen-acre tract and certain privileges in regard to the Kankakee feeder for a term of twenty years.   At the same time the flowage contract was executed, authorizing Griswold to flow the identical lands, as far as the ninety-foot strip and the sixteen-acre tract are concerned, as are mentioned in the twenty-year lease.   Construing both these instruments together and as constituting parts of an entire transaction, there is little room to doubt that the parties intended that the flowage contract would terminate with the lease upon the same premises.   The execution of the lease upon the ninety-foot strip was not an unusual transaction. The evidence shows that for many years the State has derived a very substantial revenue from leases of the ninety-foot strip.   The report of the canal commissioners for 1895 and 1896 shows that approximately $10,000 was received as rentals from the ninety-foot reserve strip.   There is clear authority under the statute for making such leases, provided the lease shall not extend beyond twenty years, and provided also that where the lease is connected with a water power it can only be made in the manner provided in clause 6 of section 8 of the statute.

Appellant contends that the flowage contract and the lease constitute a water power lease, within the meaning of that term as it is used in clause 6 of section 8 of the statute.   Appellant's position is, that since the statute forbids

the leasing of "any water power and lands or lots connected therewith," without complying with certain conditions as to advertising and appraising, and since the purpose of Griswold in obtaining these contracts was that he might use the demised premises in connection with the water power which he was intending to develop in the Desplaines river, therefore the lands and lots were connected with a water power and could not be leased without complying with the conditions of the statute, even though the water power in connection with which the premises were to be used did not belong to the State and had no connection whatever with the Illinois and Michigan canal. The fallacy of this contention is obvious. The "water power and lands or lots connected therewith," referred to in the sixth clause of section 8 of the statute, and which the canal commissioners cannot lease except by complying with the conditions imposed by the statute, are clearly the water power in the canal itself and the lands and lots connected therewith, which the State owns and which the canal commissioners are authorized to lease. It cannot be supposed that the legislature intended to give the canal commissioners the right to lease water power which the State did not own and over which it had no control whatever. The language of the sixth clause which authorizes the canal commissioners "to resume, without compensation to the lessee, the use of any such water power for the purpose of the canal, and also wholly to abandon or destroy the work by the construction of which the water privilege shall have been created," clearly shows that the water power which the commissioners had the power to lease was a water power which could be abandoned and the use of the water "resumed" whenever, "in the opinion of the legislature, said work shall cease to be advantageous to the State." There can be no doubt, it seems to us, of the meaning of this statute. It means that if a water power on the canal was leased and the drawing off of the water was found to interfere with

the use of the canal, the commissioners would have the power to cancel the lease and "resume" the use of the water for canal purposes without paying any compensation or damages to the lessee in consequence of such resumption by the State. As we have sought to show in our discussion of the question relating to the title of the State to the bed of the Desplaines river, appellee owns or controls the lands, upon both sides of the river, at the place where the dam is located. The State owned no portion of the land upon which the dam was located, in the bed of the river or on either side thereof, except the tow-path bank, to which one end of the dam was to be joined. There is therefore no basis for the argument that the flowage contract and the lease were void because they were connected with a water power privilege belonging to the State. No one would seriously contend that the owner of a farm on a river which might be affected by the construction of a dam below it would sell a water power which he did not own, simply by consenting to the flowage of his lands located above the dam. The lands embraced in the flowage contract and the lease were not used in connection with any water power on the canal. Appellee did not obtain its right to build the dam from the State, but this right, as we have seen, existed as an incident to its ownership of the land, on both sides of the river, at the place of its location.

There is a provision in the lease of September 2, 1904, which we are considering as a part of the transaction resulting in the execution of the flowage contract, which provides for a re-leasing at the expiration of the term or a renewal of the lease, provided the lessee is willing to pay as much as anyone else for the premises or an amount to be fixed by appraisement, but which should not, in any event, be less than the amount fixed in this lease. Appellant contends that the covenant for the renewal of the lease for twenty years longer was part and parcel of the leasing contract itself, which, being so construed, made the lease,

241—23

in effect, a lease for forty years, which renders it void under the statute.  The power of the commissioners to provide for the renewal of leases from time to time, not exceeding twenty years at any one time, at a rental to be fixed by appraisement, is conferred by clause 6 of section 8, and is limited to leases of "water power and lands or lots connected therewith," and has no reference to leases made by private treaty of "canal lands or lots owned by the State," which are authorized to be made under clause 5 of section 8.  The lease itself having been made under the fifth clause of section 8, the clause providing for the renewal for another term (provided for in clause 6) was improperly included in the lease.  There is no warrant in the statute for inserting such provision in any leases other than those made of "water power and lands or lots connected therewith," under clause 6.  Statutes delegating powers to public officers must be strictly construed, and all parties interested must look to the statute for a grant of power. (*Diederich* v. *Rose,* 228 Ill. 610, and cases there cited.) There being no statutory power in the commissioners to enter into the renewal provision in this lease, it necessarily follows that such provision must be held void.

But we are unable to concur in appellant's contention that the invalidity of this clause renders the entire contract void.  It does not present a case where a part of an entire consideration for the promise or agreement, or a part of an entire promise, is illegal and void.  The lease is a complete contract in all respects, obligating the lessee to pay the entire consideration for the lease for a term of twenty years.  The clause relating to the renewal of the lease for twenty years more is an independent and severable covenant, which in no way affects the validity of the lease for a term of twenty years, as therein provided.  The rule upon this subject is, that if a contract is made, consisting of two or more covenants, upon a valuable and legal consideration, and one of the covenants is illegal and the other is legal,

if the covenants are so distinct that that which is legal may be severed from that which is illegal, so that each covenant may be considered as a distinct contract, the legal covenant can be enforced and that which is illegal disregarded. (Page on Contracts, sec. 509; *Corcoran* v. *Lehigh Coal Co.* 138 Ill. 390.) In our opinion the lease in question falls under the rule above announced, and should be read and enforced as though the renewal clause was not in it.

*The deed to the sixteen-acre tract.*—On January 6, 1905, the canal commissioners made a quit-claim deed to this sixteen-acre tract to Harold T. Griswold, and appellee has succeeded to Griswold's title. Appellant contends that the canal trustees had no authority to execute the deed conveying this sixteen-acre tract to Griswold, and that, the deed being void, the title to said tract is still in the State, the protection of which will warrant a court of equity in enjoining the construction of the proposed dam. The charge made in the bill upon which the conclusion of invalidity is predicated is, that the premises conveyed were lands and lots connected with a water power privilege. The canal commissioners not being authorized by the statute to sell and convey water power privileges, or lands and lots connected therewith, it is sought to avoid this sale on that ground. The charge thus made in the bill is apparently abandoned in the briefs, but if it had not been so abandoned we do not regard the position as tenable. The deed is a conveyance to a low, marshy piece of land which the State owned, on the shore of the Desplaines river. While, as we have already seen, the conveyance of this strip carried the title to the thread of the stream, still there is not now, and never has been, any water power developed in the river opposite this strip of land. Besides, we have sought to show in our consideration of the flowage contract that the water power which the canal commissioners were prohibited from selling was water power connected with the canal itself. The evidence shows that prior to the sale

the canal commissioners applied to the Hon. Richard Yates, then Governor of the State, for his approval of the sale, and after such approval was given the sale was duly advertised in the manner and for the length of time required by the statute and the land sold to Harold T. Griswold for $500, he being the highest and best bidder, and that said consideration was paid by the purchaser and a deed executed in pursuance of the sale. There is no claim that there was any fraud or collusion between the agents of the State and the purchaser at this sale. There is no reason to believe that the consideration was inadequate. This land had been carried by the canal commissioners on their books at an appraisement of $408 and had not been sold, presumably because no one could be found willing to pay the appraised value for it. After holding it more than fifty years it was sold, as above stated, for $500.

The principal reason urged in appellant's brief why this deed should be declared void is, that the sale was not made by the commissioners in person but by a third party who acted at the request of the commissioners. This objection, it will be seen, is not stated in the bill. But even if this point were properly pleaded and proven, it would amount to nothing more than a mere irregularity, which would not justify a court of equity in declaring the sale void, in the absence of any circumstances showing that the rights of the State had been prejudiced thereby. The power to make the sale is expressly vested by the statute in the canal commissioners. They sold the land in accordance with the formalities required by the statutes and executed a deed to the purchaser. The State received and retained the purchase money and has not offered to return any part of it. The State was, in legal contemplation, the grantor in the deed through its lawfully constituted agents. In *Gunnell* v. *Cockerill*, 79 Ill. 79, and *McHany* v. *Schenk*, 88 id. 357, it was held that a sale made by an attorney of a mortgagee, under a power authorizing the mortgagee to sell, was a mere

irregularity, which would not affect the rights of innocent third parties who might afterwards acquire the title.

At the time of the sale and conveyance of the sixteen-acre tract to Griswold appellee had no connection either with the land or with Griswold. It was not until November, 1906, that appellee succeeded to Griswold's title to this land. The State took no steps to avoid the sale while the title was in the original purchaser. The records of the county exhibited a clear and unquestionable title in appellee's grantor. The irregularity complained of did not appear of record. Under these circumstances it would be a perversion of equitable principles to permit the State to have this deed declared void because of the irregularity complained of. In our opinion the deed is a valid conveyance of all interest the State then owned in the sixteen-acre tract.

*The Kankakee feeder lease.*—The Kankakee feeder has already been briefly described. It was constructed about the time the canal was completed. It was originally a navigable canal, forty feet wide at the top and twenty-six feet at the bottom, with a depth of four feet, except at its mouth, where it was five feet deep. Its purpose was to supply the canal, with which it connected, with water brought down from the Kankakee river. A wooden aqueduct resting on stone piers carried the water in the feeder over the Desplaines river to the right bank, near which the feeder flowed, into the Illinois and Michigan canal. This feeder has not been used since the canal was deepened so as to obtain a sufficient water supply from Lake Michigan. The right to remove what remained of the rock piers in the Desplaines river and to excavate the embankment of the feeder on the sixteen-acre tract north of the river and south of the canal so as to discharge the waters through section 31 in the proper manner was granted by the canal commissioners by the third clause of the flowage contract, and was included in the lease of September 2, 1904, which

have already had our consideration. On August 8, 1905, another lease was executed by the canal commissioners to Griswold, purporting to lease to him for twenty years all rights which the State had, under the control of the canal commissioners, to divert the water of the Kankakee river into the Kankakee feeder and to discharge the same into the Desplaines river in said section 31, together with the right to restore the dam across the Kankakee river, and such right as the State had to construct, at each end of the feeder, suitable gates to control the water of the Kankakee river through such feeder, and to enter upon the Kankakee feeder for the purpose of repairing the banks thereof,—all of which rights were granted subject to the rights of the Atchison, Topeka and Santa Fe Railroad Company and the Chicago and Alton Railroad Company, both of which have solid embankments across the feeder and the ninety-foot strip on the side thereof. Said lease gave to Griswold the option of abandoning the premises at any time after five years by giving notice and restoring the feeder to its present condition, if required so to do. Said lease also provided that the canal commissioners might cancel the lease at any time, "whenever, in the judgment of the canal commissioners or other proper officers of the State having charge of canal property, they shall deem the interest of the State required it to re-possess and use the property for State purposes." Said lease was made in consideration of $150 per annum, payable on the tenth day of August, 1905, and on the tenth day of August in each and every year of said term. The lease also contained a renewal clause similar to that already discussed in reference to the lease of September 2, 1904. On November 27, 1907, the legislature adopted the following joint resolution:

"Whereas, the canal commissioners appointed under and by virtue of 'An act to revise the law in relation to the Illinois and Michigan canal and for the improvement of the Illinois and Little Wabash rivers,' approved March 27, 1874, in force July 1, 1874, have at various times heretofore executed leases of water power

and water privileges to private individuals and corporations, under and by virtue of the powers granted to said commissioners by section 8 of the above entitled act, and that among the said leases were certain alleged leases or agreements to Harold T. Griswold, dated September 2, A. D. 1904, purporting to grant and convey certain rights and privileges in and to the waters and water power of the Desplaines and Kankakee rivers; and whereas, the said Harold T. Griswold or his assignees, by virtue of said alleged leases or agreements, are building and constructing certain dams, controlling works, locks and other obstructions in and across said streams, which, in the opinion of this General Assembly, are destructive of the navigation of said streams and to the disadvantage of the State of Illinois; and whereas, the sixth clause of section 3 (8) of said act provides, among other things, as follows: 'All leases of water power and extensions thereof shall be subject to the right of the commissioners to resume, without compensation to the lessee, the use of any such water power for the purposes of the canal, and also wholly to abandon or destroy the work by the construction of which the water privilege shall have been created, whenever, in the opinion of the legislature, such work shall cease to be advantageous to the State;' and whereas, the construction of such dams, controlling works, locks and other obstructions being erected and constructed by the said Harold T. Griswold or his assigns have ceased to be advantageous to the State, and that such water power and water privileges purporting to have been granted in and by virtue of said alleged leases or agreements are necessary for the purpose of the canal; therefore be it

"*Resolved by the House of Representatives, the Senate concurring therein,* That the said canal commissioners are hereby empowered and directed to cancel and annul said alleged leases or agreements and any and all extensions thereof, and to resume all such water power and water privileges therein purported to have been granted to the said Harold T. Griswold by the said canal commissioners on September 2, A. D. 1904, and that said water power and water privileges be restored for the purpose of the canal, and that all such dams, controlling works, locks and other obstructions therein existing for the purpose of creating such water power and water privileges be forthwith abandoned and destroyed by such canal commissioners."

Appellant contends that the adoption of this resolution had the effect of canceling this lease, and assigns two reasons therefor: (1) Because the legislature is the "proper officers of the State in charge of canal property," within the meaning of the language of the lease whereby the right to cancel is reserved; (2) that said contract is a lease of

water power, and that the State had the right, under the statute, to resume the use of the water and cancel the lease "whenever, in the opinion of the legislature," it was advantageous to the State to do so. Neither of these contentions can be sustained. The clause in the lease reserving the right to cancel it to "the canal commissioners or other proper officers of the State at such time having charge of canal property," means that the canal commissioners, or such other officers or agents as the State may designate by law to have charge of the canal properties instead of the canal commissioners, shall exercise the right of cancellation. If the State should abolish the board of canal commissioners and create some other agency to have charge of canal property, such other substituted agency could probably exercise the right of cancellation. The right to declare this contract at an end by one party thereto without the consent of the other party should be strictly construed, and so long as the State continues the board of canal commissioners in charge of canal property they are the only officers who can exercise this reserve right. The right under the contract does not arise until in the judgment of the canal commissioners "the interest of the State requires it to re-possess and use such property for State purposes." The discretion or judgment to be exercised, under the terms of the agreement, by the canal commissioners cannot be exercised by other State officials in another department of the State government. The second ground is equally untenable. This lease is not a water power lease, within the meaning of the statute. We have already expressed our views as to the meaning of water power leases, and for the reasons heretofore given appellant's second point cannot be sustained. If this contract was a water power lease, or lands and lots connected therewith, it would be void for other reasons, regardless of the legislature's resolution.

There is still another reason why this lease is not affected by the joint resolution. It will be seen that the reso-

lution is directed against certain leases made to Harold T. Griswold on September 2, 1904. Apparently this resolution refers to the flowage contract, the lease of the ninety-foot strip and the pole lease, which were the only contracts executed between the canal commissioners and Griswold on that day. The Kankakee feeder lease was executed August 8, 1905, and therefore does not come within the purview of the joint resolution. The observations which we have heretofore made in reference to the renewal clause will apply to appellant's objection based on that clause in the lease now under consideration.

Appellant contends further that this lease is void because the Kankakee feeder is an integral part of the canal, and that the commissioners, under no circumstances, have any power to lease the canal itself or any of its parts. Undoubtedly this view is sound as applied to leases which would interfere with the uses of the canal for navigation purposes. All the powers of the canal commissioners should be exercised in such way as to promote the object for which the canal was constructed. All of the powers granted to the canal commissioners have been carefully safeguarded, so that their exercise would promote, and not obstruct or defeat, the primary object the State had in view in lending its generous patronage to this great public enterprise. The Kankakee feeder was originally a necessary part of the canal. It was used not only to supply the canal with necessary water, but the feeder was also used as a navigable canal, through which boats passed back and forth between the Kankakee river and the Illinois and Michigan canal. As already pointed out, about the year 1888 the use of this feeder was discontinued. The dam in the Kankakee river below the head of the canal, which had been used to divert the water of the Kankakee river into the feeder, had been removed and the river restored to its original channel. The wooden aqueduct and the stone piers upon which it stood, through which the waters of the feeder were passed over

the Desplaines river, had been allowed to fall into decay. The mouth of the feeder had been filled up under the direction of the canal commissioners. Two railroads had been permitted to construct solid embankments across the feeder, upon which they maintain tracks and operate railroads. Farmers owning lands along the feeder have been allowed to cut down the banks and run fences across the feeder without restriction. There is not the remotest probability that this feeder will ever again be used by the State in connection with the canal.

It appears from the foregoing facts that the validity of the lease of this feeder cannot be questioned on the ground that the exercising of the rights granted will interfere in any way with the rights of the State or the public in the canal. With an ample supply of water from Lake Michigan it is not within the range of reasonable probability that this channel will ever be needed to feed the canal. Engineer Cooley testified that he could not foresee any state or condition which would render its future use necessary. But even if we may suppose a possibility that this feeder may be again needed by the State, the power to cancel this lease is expressly reserved to the canal commissioners. Again, if such necessity should arise, the things that the lessee is authorized to do by this lease would seem to be in line with the reconstruction of such feeder so that it would become usable. The lessee is authorized to reconstruct the dam in the Kankakee river, to repair the banks of the feeder and to perform other work necessary to cause the water to again pass through the feeder, all of which would be advantageous to the State should it again desire to use this channel. In our opinion there is no legal reason why the canal commissioners may not treat this abandoned feeder, and the lands and lots connected therewith, as other canal property, and lease the same during such time as it is not needed, for any lawful purpose that does not interfere with whatever rights the State may have to resume the use of this

feeder for canal purposes. The title of the State to this feeder was not acquired by a grant from the United States government, as was the case with the canal proper, but the right of way for the feeder was obtained, in part, at least, by deeds from private owners of the lands over which it passed. A number of such deeds were introduced at the trial, and all of them contained the following condition: "Provided, however, if the said feeder should not be constructed over and through the said premises, or if, after the construction of the same, it should be by the decision of the board of trustees, their successors or assigns, abandoned and discontinued or the route thereof changed so as not to be continued over the said premises, then and in that case the said lands hereby granted shall revert to the said . . . . . . . . . . . . and assigns." The blank in the last line was filled in with the name of the grantor. The evidence shows that as to a portion of the right of way for the feeder no paper title in the State could be found. It thus appears that a question may arise between the State and those entitled to the reversionary interest under the deeds, whether the State has any title or interest in the right of way of this feeder. This question we do not determine. The claimants of such reversionary interests are not parties to this suit. Such rights, whatever they may be, will not be affected by the lease or anything that may be done by appellee thereunder. Without determining whether the State has any title or rights in the right of way of this feeder as against persons who may have succeeded to the reversion, and without deciding that the lessee has acquired any rights under the said lease as against such reversioners, our conclusion is that, as between the State on the one hand and the appellee on the other, no legal reason exists why this contract should be declared void.

*The pole lease.*—The contract designated "the pole lease" was executed September 2, 1904, between the canal commissioners and Griswold, and grants to the lessee the

right to erect and maintain a line of poles along and upon the land belonging to the State, part and parcel of the Illinois and Michigan canal lands, to be located between the west line of section 25, township 34, range 8, in Grundy county, to Roby street, in the city of Joliet, in Will county, and between said west line of said section 25 and the western limits of the city of Morris, said line of poles to be placed on the berm side of the canal under the directions of the officers of the canal. Said lease is for a term of twenty years, and is made subject to existing pole leases, and also subject to the right to require a change in the location of the poles at any time when, in the judgment of the superintendent or person in charge of the canal property, such change is necessary. The consideration paid for this lease is $1000. Said poles are to be used by the lessee only in stringing wires to carry electricity generated at the proposed plant. The lessee agrees and covenants to erect and maintain the poles and wires in a good and workmanlike manner and in such way as not to interfere with the business of the canal or the property of others, and to assume all liability for deaths or personal injuries that may result from the use of such poles and wires, and to indemnify and save harmless the canal commissioners for all claims for damages to either persons or property. Neither this lease nor the Kankakee feeder lease is of vital importance to the decision of the appellant's right to enjoin the construction of the proposed dam. Whatever view we might entertain in respect to these two contracts, it could not influence the ultimate result of this litigation. There are no reasons urged against the validity of the pole lease which have not been considered in connection with the other contracts, except that appellant contends that the pole lease gave the lessee the control of the tow-path of the canal for a distance of twenty-five miles. This is a misapprehension. The poles are to be placed on the berm side of the canal, which is the opposite side from the tow-path, except

"where, in the judgment of said superintendent or officer, the topography of the ground makes it necessary or expedient to have said poles upon the tow-path bank of said canal, the authority is hereby given to said party of the second part to cross said canal and place poles along the said tow-path bank, the necessity or expediency thereof, the place and manner of crossing and placing said poles along said tow-path bank to be subject to the approval and under the direction and supervision of said superintendent or officer. It is distinctly understood, however, that the aforesaid line of poles shall not, in any event, be located or maintained in such place or manner as to interfere with the use or operation of said canal." As thus carefully guarded we are unable to see how it will interfere with the use of the canal or the tow-path. Unless it does so interfere, we see no reason why the contract should be declared void.

*Conclusion.*—It is seldom a case is presented to a court involving so many questions, both of law and fact, as are presented by this record. We have given the questions involved that careful consideration which their importance seems to demand. In view of the wide range covered by the evidence and the able and exhaustive arguments of counsel we have found it impracticable to discuss all of the questions raised or notice in detail all of the arguments presented, within the reasonable bounds of an opinion. We have, however, considered all of the questions, and discussed such of them in the preceding opinion as appear to be necessary to a proper determination of the legal rights of the parties. After giving due consideration to all that has been said by counsel in support of the several contentions of the State, together with such additional matters as our own investigation has disclosed, we have reached the conclusion that there is no equity in appellant's bill and that the same was properly dismissed by the court below.

The decree is affirmed.            *Decree affirmed.*